### BUTLER v. BARRET & JORDAN.

(Circuit Court, M. D. Pennsylvania. June 24, 1904.)

1. LIBEL—EVIDENCE IN JUSTIFICATION.

In an action for libel by the publication of an article which unmistak·ably referred to plaintiff, evidence is not admissible in defense to show that there was a foundation in fact for the statements made, where it is not shown that such facts related in any way to plaintiff.

2. SAME—EVIDENCE IN MITIGATION.

In an action for libel, facts are not admissible in mitigation of damages which were not known to defendant when the publication was made.

¶ 2. Mitigation of damages for libel and slander, see note to Sun Printing & Publishing Ass'n v. Schenck, 40 C. C. A. 168.

See Libel and Slander, vol. 32, Cent. Dig. § 159.

3. SAME—IDENTITY OF PLAINTIFF WITH PERSON REFERRED TO IN PUBLICATION.
Whether a newspaper article alleged to be libelous was intended to apply to plaintiff, and would be so understood by readers, is a question to be determined by the jury from the statements made in the article itself and their application to plaintiff; and evidence to show that the occurrences on which the article was based related to another person, which fact was unknown at the time to both defendants and the readers of the article, has no relevancy to such issue.

4. INSTRUCTION—EXPRESSING OPINION UPON THE FACTS.
Where the decided weight of evidence on an issue is in favor of one party, it is not improper for the judge in a federal court to express his opinion to that effect in his charge to the jury, leaving it to them, however, to determine the fact.

5. LIBEL—DAMAGES—MENTAL SUFFERING.
Where an article in respect to a woman, found by the jury to relate to plaintiff, was clearly libelous and defamatory, falsely charging that she had committed a crime for which she was sent to prison, and with having become in other respects degraded, the jury may consider the mental suffering resulting to her from the libel in estimating her damages as a matter of general knowledge and experience.

6. SAME—INSTRUCTIONS—PUNITIVE DAMAGES.
Where defendants published a grossly defamatory libel concerning plaintiff, copying the statements made therein from another paper without inquiry as to their truth, and in the face of a retraction, an instruction to the jury that it was within their power to award punitive damages on account of defendants' carelessness, but that in the judgment of the court it was not a case for such damages, was not prejudicial to defendants' rights, especially where the verdict returned was such as to indicate that such damages were not given.

7. SAME—EVIDENCE.
Where defendants in an action for libel sought to justify or extenuate the publication by showing that the article was copied from another paper, evidence was admissible to show that such paper published a full retraction five days before the article was published by defendants.

On Rule for New Trial.

Everett Warren, for the rule.
Henry N. Paul, Jr., opposed.

ARCHBALD, District Judge. This is an action for the publication in the Scranton Truth, of which the defendants in August last were the proprietors, of an article which related to the plaintiff—as it is claimed—and was a libel upon her. Until within a year or two past, under the stage name of "Annie Oakley," she was connected with the "Wild West Show" conducted by W. F. Cody, familiarly known as "Buffalo Bill," and gave exhibitions of her skill with the rifle in almost daily performances all over the United States and in several countries of Europe, and particularly at the World's Fair at Chicago in 1893 and at Buckingham Palace before the present King of England, then Prince of Wales. This explanation will show the application of the article of which complaint is made, which is as follows:

"Annie Oakley in Prison Cell.

"A Chicago dispatch to the Philadelphia Press last week says: 'Annie Oakley, daughter-in-law of "Buffalo Bill," and the most famous woman rifle shot

¶ 5. Mental suffering as an element of damages, see note to Chicago, R. I. & P. Ry. Co. v. Caulfield, 11 C. C. A. 556.

130 F.—60

in the world, lies to-day in a cell at the Harlem Street Station, under a Bridewell sentence, for stealing the trousers of a negro in order to get money with which to buy cocaine.'

"This is the woman for whose spectacular marksmanship King Edward himself once led the applause in the courtyard of Buckingham Palace.

"When arrested Saturday on the complaint of Charles Curtis, a negro, she was living at 140 Sherman street.· She gave the name of Elizabeth Cody, but it occurred to no one to connect her with Colonel Cody's famous daughter-in-law. To-day, however, when brought before Justice Caverly she admitted her guilt.

" 'I plead guilty, your honor, but I hope you will have pity upon me,' she begged. 'An uncontrollable appetite for drugs has brought me here. I began the use of it years ago, to steady me under the strain of the life I was leading, and now it has lost me everything. Please give me a chance to pull myself together.'

"The striking beauty of the woman, whom the crowds at the World's Fair admired, is gone. Although she is only twenty-eight years old, she looks almost forty. Hers, in fact, is one of the extreme cases which have come up in the Harrison street police court. She was taken to Bridewell to serve out a sentence of $25 and costs.

" 'A good long stay in the Bridewell will do you good,' said the court.

"The prisoner's husband, Samuel Cody, died in England. · Their son, Vivien, is now with Colonel Cody at the latter's ranch on the North Platte. The mother left 'Buffalo Bill' two years ago, and has since been drifting around the country with stray shows."

At the trial the defendants offered in evidence the depositions of witnesses taken in Chicago with respect to the origin of the article, which the court excluded. This testimony was ·brought forward for two avowed purposes: First, to establish that there was a foundation in fact for the article, there having been such an arrest and proceedings as are described in it; and, second, on the question of identity, to show that it had reference to another person than the plaintiff, to wit, to Elizabeth Cody, the woman who was arrested. The depositions, as taken, are full of irrelevant and incompetent matters, which would of itself be sufficient to justify their exclusion, the court not being called upon to separate the good from the bad, and the whole being offered together. But, passing that by, there was no mistake in rejecting them. It is not necessary to dwell at length upon the first purpose. It may be that the testimony elicited by the depositions goes to show a certain measure of truth, or foundation in fact, for the statements contained in the article, so far as concerns the person who was arrested; but certainly none is disclosed, as to the plaintiff in this action, to whom the article is made to apply, not only by her stage name, Annie Oakley, but by allusions to incidents of unmistakable significance in her professional career. As a justification, therefore, it fails utterly. And it is equally unavailing in mitigation of damages. There is no pretense that the original facts on which the Chicago reporter worked up this sensational story were ever communicated to the defendants, and they certainly cannot set up in extenuation of their actions something, however true, of which they had no knowledge. Hatfield v. Lasher, 81 N. Y. 246; Sun Printing Association v. Schenck, 98 Fed. 925, 40 C. C. A. 163; Morning Journal Association v. Duke (C. C. A.) 128 Fed. 657.

Nor were the depositions admissible for the purpose of showing to whom the article was intended to apply. Undoubtedly, it was for

the jury to say whether it referred to the plaintiff; and, unless it did, the action would not lie. But this was to be determined by the allusions contained in the article itself and their application to her (Clark v. North American Co., 203 Pa. 346, 53 Atl. 237), upon which the excluded testimony threw no light. It merely showed the arrest in Chicago of a woman who said that she was Annie Oakley, and who seems to have persuaded the reporter who interviewed her that such was the case; and that what was stated in the article with regard to the debased condition and life of this person was true. But the question is not whether the reporter had any basis of fact to work upon, but whether, in the way the incident was dressed up and sent out to the world, it would be understood by the reading public to apply to the plaintiff identified by her professional career and name; and on this the occurrence which prompted the article in no wise bears. Plainly, the person who is made the subject of it is "Annie Oakley," the famous crack shot, who had traveled with the "Buffalo Bill Show," and was identified for so long with it. Not only is her name put at the head of the article, but allusion is made to the crowds who saw her at the World's Fair, and to the applause which she received when performing before the King at Buckingham Palace— things which were true, and could be true, of no one else. The whole "spice" and interest of the item as a matter of news is because of its dealing with such a celebrity. It is the once admired and applauded performer who is held up to observation and obloquy, contrast being made with her present debased condition; and it is only as she is thus identified with the fallen woman brought up for sentence by the Chicago police and committed to Bridewell that the general public could be expected to have any concern with the matter. It is true that there are some references found in the article which admittedly do not fit the plaintiff, such as the name Elizabeth Cody, given by the woman, her asserted relationship to "Buffalo Bill," and the existence of a son Vivien. But these are of minor importance, and go simply to the question whether the article as a whole would be understood to refer to the plaintiff, of which the defendants had full advantage by way of argument. To allow them to go further, and lay before the jury all that was said and done—relevant and irrelevant—in and about the Chicago police court, which gave rise to the article, of which neither the defendants nor the readers of their paper had the slightest knowledge, would be to obscure the issue, and divert attention from the real inquiry, which the court was right in prohibiting.

Complaint is further made of the way the case was submitted to the jury. It left nothing for them—as it is said—but to return a verdict for the plaintiff for substantial damages, the court injecting its own ideas into the charge, and constraining their judgment. On the undisputed facts there were but two questions to dispose of. The libelous character of the article could not be gainsaid. It held up to public odium the party referred to in it, whoever that was, attributing to her a low and degraded life in marked contrast with her former position. Actual crime was also ascribed to her in the stealing of a pair of trousers from a negro. There being no legal justification for these statements, malice in publishing the article was presumed. The

only things, therefore, for the jury to pass upon were (1) whether the article applied to the plaintiff; and (2) if it did, the damages to which, in their opinion, she was entitled. It is contended that these were not given to the jury in a way that left them open to their own untrammeled judgment. There unquestionably was a decided expression of opinion that the article was intended to apply to the plaintiff, but this expression did not go outside of the evidence, and the court is not called upon to render a colorless charge. It is, on the contrary, its duty to point out where is the weight of the evidence, and a charge which does not do so is as misleading as one which gives undue prominence to either side, where there is a real controversy. The right of a judge in the federal courts to express his opinion on the facts is well established (Rucker v. Wheeler, 127 U. S. 85, 8 Sup. Ct. 1142, 32 L. Ed. 102); and it has even been held that, where the evidence is all one way, so that a verdict to the contrary would have to be set aside as against the decided weight of it, the court may direct a verdict either for plaintiff or defendant (Gentry v. Singleton [C. C. A.] 128 Fed. 679). In the present instance there was no error in calling the attention of the jury to the strength of the evidence in favor of the plaintiff, which, with due respect to counsel, was all that was really done. That the plaintiff, Annie Butler, was familiarly and widely known by the name of Annie Oakley, and performed with the "Buffalo Bill" show in the way referred to in the article, was virtually conceded, or, if not, was so positively proved as to be practically uncontroverted. With this established, the rest was a mere matter of deduction from the article itself and the allusions contained in it, which pointed unmistakably to the plaintiff and applied in fact to no other. It is true that there are some matters which do not do so, such as the name Elizabeth Cody, the relationship by marriage to "Buffalo Bill," etc. But, as already stated, these are minor and subordinate, and do not divert the mind from the real personage who is the subject of comment. Starting out with the title, "Annie Oakley in Prison Cell," the references under this heading admit of but one conclusion, and that is that the plaintiff, identified by her stage name, profession, and performances, was intended by the article; and the court was justified in so declaring to the jury, leaving it, nevertheless, for them to say—as was done—whether that was really the fact.

But it is said that the court practically required of the jury a verdict for substantial damages, when they ought to have been permitted to give nominal damages only, if they chose. This is not a fair criticism of the charge, nor can it be successfully maintained that any such constraint was put upon them. The different kinds of damages were fully and carefully explained to them, and the accepted rule laid down that they were to give such as, in their judgment, would compensate the plaintiff for the injury, if any, which she had suffered. It was pointed out in this connection that she had shown no special damages, or such as affected her in her profession as a crack shot performer, proof having been given out of her own mouth that a new engagement of the same character, and with the same troupe as before, had been offered her since the libel, which she had been prevented from accepting solely by reason of ill health. Defendants'

third point also was affirmed, by which the jury were instructed that, no actual pecuniary loss having been shown, substantial damages were not to be given, if the evidence in mitigation of damages satisfied them that they ought not to be. It is true that attention was called to the fact that the plaintiff's general reputation was involved, the mention of her by her professional name not doing away with her individual or personal standing in the community. And the jury were also told that they might consider what, if any, mental suffering the article would be likely to cause, having regard to the fact that the plaintiff was a woman, and had a woman's reputation to defend. Complaint is made that she was thus put on a level, in matter of respectability, with the mothers and sisters of the land, of honest life and reputation, when the fact is that she followed a low calling as a mere circus performer. But I recall no evidence that throws the least discredit upon her personally, and, without it, the law, if not ordinary chivalry, accepts her as of equal respectability with any others. It is to be observed that in this and other references care was taken to say to the jury that there was no intention of inflaming their minds, or carrying them beyond that which was their own sober and reasonable judgment. It is urged, however, that nothing could be given for mental anguish without proof that the plaintiff had actually suffered it. But injury to the feelings, as a matter of common experience, is one of the most immediate, as it is one of the keenest, results of such a libelous article, and it may be, therefore, taken into consideration by the jury simply from their general knowledge. 18 Am. & Eng. Enc. Law (2d Ed.) 1883; Bergmann v. Jones, 94 N. Y. 51; Smith v. Sun Printing Association, 55 Fed. 240, 5 C. C. A. 91.

In view of the verdict, which was only $900, the question of punitive damages can hardly be regarded as more than academic. But, in any event, I do not see that serious objection could be made to the instructions upon that subject. Even without proof of actual malice, it is doubtful whether the question could have been withdrawn from the jury (Callahan v. Ingram, 122 Mo. 355, 26 S. W. 1020, 43 Am. St. Rep. 583; Hintz v. Graupner, 138 Ill. 158, 27 N. E. 935; Hamilton v. Eno, 81 N. Y. 116; Bergmann v. Jones, 94 N. Y. 51; Blocker v. Schoff, 83 Iowa, 265, 48 N. W. 1079); and it certainly could not, in view of the evidence which warranted a finding that the publication was carelessly, if not recklessly, made, having been copied from another paper without inquiry, and in the face of a retraction (Regensperger v. Kiefer [Pa.] 7 Atl. 724; Holmes v. Jones, 121 N. Y. 461, 24 N. E. 701; Smith v. Sun Printing Association, 55 Fed. 240, 5 C. C. A. 91). But it is not necessary to dwell upon this, for the defendant certainly had no reason to complain of the way it was treated by the court. "The plaintiff asks me to instruct you further," it is said in the charge, "that in this case you should award punitive damages, to punish the defendants because of carelessness in the publication of this article. I think this a matter for you. If you see in the case (there being confessedly no special enmity on the part of the defendants) anything by reason of the carelessness on their part, in repeating this libel without any attempt to verify it, to award a further sum to meet the aggravation of the case, as something to punish the defendants, I suppose it is in

your power to do so; but it seems to me there is hardly anything of that kind in the case." This was as favorable to the defendants as they could expect. The court could hardly say anything and say less. The jury were distinctly advised that, while it was in their power to give extra damages, it was not, in the judgment of the court, a case in which they ought to do so; and if, as has been argued, the jury were liable to be influenced by the opinion expressed in other matters, why may we not equally conclude that they were also in this? From the size of the verdict—as already intimated—they evidently were. This instruction also does away with the mistake, if any, in refusing the defendants' tenth point. The jury having been told that the case, as it stood, was not one in which they ought to give more than compensatory damages, it did no harm that they were not further instructed not to give any unless certain conditions were found to exist. This would weaken, rather than strengthen, the other, because it left it open for them to do so, if they did. The same is true of the defendants' second point, which was also refused, although this was otherwise objectionable, and could not have been affirmed. By it the court was asked to say as a matter of law that the plaintiff was simply entitled to what would compensate or make her whole if the jury believed that the article was published without express malice, and merely taken from the Philadelphia Press as an item of news, without intent to injure the plaintiff, and believing it to be substantially true. No doubt the circumstances referred to were to be considered by the jury, if the question of giving punitive damages arose; but the court could not say that such damages should not be allowed, notwithstanding them, if the jury, upon the whole case, thought that there was occasion for doing so. The point leaves out of sight that they might have considered the publication to have been so carelessly or recklesssly made as would have justified the imposition of "smart money." In the Morning Journal Association v. Rutherford, 51 Fed. 513, 2 C. C. A. 354, 16 L. R. A. 803, the defense—the same as here —was that the article had simply been copied from another paper, the New York Sun. "On seeing the article in the Sun," said the editor in his testimony, "we were not supposed to make any inquiry as to the truth of it, and I did not make any"; as to which it was said by Lacombe, J., speaking for the Court of Appeals of the Second Circuit: "If this does not evidence a reckless indifference to the rights of others, which is equivalent to an intentional violation of them, it is somewhat difficult to conceive what will." And again: "When the publisher of a libel urges as his sole defense that it is the custom of his paper to print such stories as this, whenever they have appeared in the columns of another paper, without inquiry as to their truth, he manifests such complete indifference to another's rights—such reckless unconcern as to the mental anguish he may cause—as will warrant a jury in finding him guilty of wanton negligence." In the present instance, not only was the same thing true, but there was the added circumstance that the original journal had published an intermediate retraction. Complaint is made at the admission of this evidence, but the defendants having endeavored to extenuate, if not justify, the publication by its previous appearance in the columns of

the Philadelphia Press, it was competent on the question of negligence to show, as was permitted to be done, that in the issue of that paper of August 15th—five days before the publication in the Truth—the whole item was retracted. This paper being one of the defendants' recognized exchanges, it was a question for the jury whether, in the exercise of proper care, they ought not to have seen and been warned by the later assertion.

There are other matters which are relied upon, some 18 reasons in all being assigned for a new trial; but I will not stop to consider them. With every desire to rectify any mistake that was made to the detriment of the defendants, I am not persuaded that there was any of which they can justly complain.

The rule for a new trial is discharged.