## MORNING JOURNAL ASS'N v. DUKE.

### (Circuit Court of Appeals, Second Circuit.   March 1, 1904.)

### No. 97.

**1.** **LIBEL—CONSTRUCTION OF LIBELOUS ARTICLE—JURY QUESTION.**

A libelous article appeared with headlines as follows: "Murdered Many for Insurance.   Agent Here to Probe into a Horrible Conspiracy.   Half a Dozen in It.   Most Prominent Business Men of S. Incriminated." Smaller headlines announced the amount of money made by the plotters; that New York insurance companies were selected to be victimized; and that policies were taken on invalids, and when they did not die quickly enough they were poisoned.   Below these headlines a panel was formed by a border of stars, making it specially prominent, in which under the title "The Conspirators" six persons were mentioned, including plaintiff.   In another panel were given the number of those who died by disease and by poison, and whose lives were attempted, etc.   Subheadings distributed through the article read:   "How Suspicion was Aroused;" "Had been Killed by Strychnine;" "L. Sentenced to Death;" "Supreme Court Judge Aids J.;" "Given Poison in Whiskey," etc.   The narrative in small type fairly imported as a whole that plaintiff was a member of the conspiracy and one of the beneficiaries who profited by the frequent mysterious deaths, which had been brought about by poison, though it directly charged him only with fraudulently issuing policies on bad risks. *Held*, that it was not error to charge as a matter of law that the article imputed to plaintiff the crime of being one of several conspirators who had engaged in obtaining fraudulent insurance upon the lives of decrepit and infirm persons whose death, when disease failed, had been brought about by poison.

**2.** **SAME—PLAINTIFF'S REPUTATION.**

In a libel suit it is not error to admit evidence of plaintiff's general social and business standing.

**3.** **SAME—DEFENDANT'S SOURCE OF INFORMATION.**

Where, in a suit for publishing a libelous newspaper article, plaintiff seeks to recover exemplary damages by showing that the publication was wanton and reckless, and defendant has been permitted fully to show every particle of information relied on by its reporter when he wrote the article, and the documents which the reporter received from a third person are all admitted, and both he and such third person testify fully as to everything that passed between them, it is not error to exclude evidence of an investigation made by such third person, but of which defendant or its agents were not informed when the article was written and its publication determined on.

**4.** **SAME—ACTS OF CO-CONSPIRATOR.**

In a libel suit for publishing an article charging plaintiff with having been a conspirator in a scheme to procure fraudulent life insurance and murder the insured, evidence that two other conspirators had made an attempt to poison one of the insured, and that one of them had been indicted, tried, and convicted for murder, is inadmissible.

**5.** **SAME—INSTRUCTIONS—OTHER OFFENSES.**

In a suit for publishing a libelous article charging plaintiff with being a conspirator in a scheme to fraudulently issue insurance policies on the lives of decrepit and infirm persons, and, where they did not die quickly enough, to poison them, it is proper to instruct that if the libel charges plaintiff with murder it is neither a defense nor a mitigation of damages to prove that he was guilty of fraud.

---

¶ 2. See Libel and Slander, vol. 32, Cent. Dig. § 302.

6. SAME—AMOUNT OF RECOVERY—REVIEW.

> Where no instructions were objected to, and no exceptions reserved, an objection to the charge on the subject of exemplary damages cannot be reviewed.. . .

In Error to the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 120 Fed. 860.

This cause comes here upon writ of error to review a judgment of the United States Circuit Court, Southern District of New York, in favor of defendant in error, who was plaintiff below. The action was for libel, and the verdict of the jury awarded $36,000 damages. A motion was made for a new trial on the ground that the verdict was excessive, whereupon the trial judge carefully reviewed the testimony and the record as it was presented to the jury, and reached the conclusion that "although the defendant justly brought upon itself the severe condemnation of the jury, they visited the offender with too heavy a hand, and exceeded the boundaries of a just discretion," and that a new trial would be granted unless plaintiff stipulated to reduce the recovery to $20,000. The stipulation was given, and judgment entered accordingly.

Edward M. Shepard, for plaintiff in error.

A. J. Rose, for defendant in error.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). Many of the assignments of error are concerned with propositions which have already been considered and passed upon by this court in other causes; such assignments may therefore be disposed of by a brief reference to the earlier decisions. It will facilitate the presentation of the cause to discuss the assignments which have been argued here in a somewhat different order from that in which they are presented on the briefs.

1. It is contended that the court erred in refusing to permit the jury to construe the article. This assignment of error is based upon exceptions to portions of the charge and to a refusal to charge. The portions of the charge objected to are as follows:

> "That article, in substance, imputed to the defendant the crime of being one of several conspirators who for a number of years, in the state of Mississippi, had been engaged in obtaining fraudulent insurance upon the lives of decrepit and infirm, and, when disease failed, hastening their death by poisoning."

> "I may not state the language literally; you have the article, and if I fall into any error you will correct me. The substance of it was that not only did these persons, who were spoken of as the most prominent business men of Scooba, Mississippi, engage in this scheme of fraudulent insurance, but they had carried out the object which they had in view by destroying the lives of the insured." .

> "The article thus charged the plaintiff with complicity in an atrocious crime or series of crimes."

. . The defendant requested the court to charge "that it is for the jury to say upon reading the article whether it charges any specific offense against this plaintiff," which was refused.

It is well settled that when there is ambiguity in the language used, so that the alleged libel is capable of being understood in an innocent and harmless as well as in an injurious sense, its true interpretation is a question for the jury; and it is equally well-settled that if, upon an examination of the whole document, it appears to admit of no just con-

struction except one which is injurious to the plaintiff, its meaning is to be determined by the court. Lewis v. Chapman, 16 N. Y. 369. Defendant concedes that the article was libelous, since it distinctly charged that plaintiff was guilty of participating in writing fraudulent insurance, but contends that upon a dispassionate and critical reading of the article "the jury might have found that the article in its entirety did not fasten the charge of murder on the defendant in error." The point here raised can be determined only by an analysis of the article in question.

The original is before us. It appears on the seventh page of the issue of Monday July 19, 1897, and is the first article on that page, practically filling three columns. It begins with the following headings, each separated from the one next succeeding it by a dash, printed in capitals of varying size, but all of them conspicuously displayed.

"Murdered Many for Insurance."
"Agent Here to Probe into a Horrible Conspiracy."
"Half a Dozen in It."
"Most Prominent Business Men of Scooba, Miss., Incriminated."

Next follow four more headings, printed in smaller-sized type, separated by dashes, and also arranged so as to challenge the attention of the most casual reader of the paper. They are as follows:

"Seventy Five Thousand Dollars Made By Plotters."
"New York Insurance Companies were Selected for Victimization by the Conspirators."
"Policies Taken on Invalids."
"When They did not Die Quickly Enough to Suit Plotters They were Given Strychnine or Arsenic."

Immediately below this is a sort of panel formed by a border of stars, which makes it especially prominent, and containing the following:

"The Conspirators.
"Dr. W. H. Lipscomb, practitioner, of Scooba, under sentence of death for murder by poison.
"Guy Jack, merchant, indicted for murder by grand jury and out on bail.
"A. A. Hammack, merchant.
"H. Rosenbaum, merchant.
"J. H. Duke, business man of Scooba.
"———— Kramer, business man of Scooba."

It will be observed that the heading stated that there were "half a dozen in it;" and that six conspirators are named, of which the plaintiff, Duke, is one. Next follows another similar panel containing this:

"Robinson's estimate of the operation of the crowd:

Policies in which the members appeared as beneficiaries........ 100
Number who died by disease............................... 30
Number who died by poison................................ 12
Number whose lives were attempted......................... 15
Policies now canceled.................................... 60
Amount cleared and divided by the plotters.................. $75,000
Still to be paid and divided............................. 15,000"

Then follows another panel containing a letter alleged to have been written by Guy Jack, offering to turn state's evidence. This is succeeded by a long narrative in fine type, broken up by the following subheadings in small capitals:

"How Suspicion was Aroused."

"Had been Killed by Strychnine."

"Lipscomb Sentenced to Death."

"Supreme Court Judge Aids Jack."

"Given Poison in Whiskey."

"Jack's Cool Admissions."

The narrative begins with the statement that W. D. Robinson, a newspaper publisher of Meridian, Miss., has been in this city [New York] for several days in consultation with the officers of life insurance companies, his object being to bring to light the facts in a frightful conspiracy to defraud insurance companies by insuring invalids and decrepits, and, where disease failed, to hasten the death of the victims by means of poison. It states that some of the most prominent men in Scooba are involved; that one is under sentence of death for murder, and another under indictment for the same crime, while "there are still others in the conspiracy." It then describes how insurances were issued on invalids and decrepits; how suspicion was aroused by "the frequent mysterious deaths that occurred" in Scooba, the beneficiaries being almost invariably "a few citizens prominent socially and in a business way"; how the death of one Stewart induced an investigation which showed he had been killed by strychnine, Guy Jack being the beneficiary under his policies. It then gave an account of the indictment, trial, and conviction of Dr. Lipscomb; the indictment and bailing of Guy Jack; the attempt to kill one Eaves by whisky containing arsenic, for which an indictment was found against Rosenbaum. It concluded with the statement that in proceedings in a certain chancery suit Guy Jack made admissions directly implicating other men in the conspiracy, and quoted the following from his alleged testimony:

"Dr. W. H. Lipscomb was a very handy man for J. H. Duke, A. A. Hammack, H. Rosenbaum, and myself in taking out insurance policies on bad risks for insurance companies." "Did you and Duke and others take out policies on bad risks for insurance companies? I certainly did; and Col. Duke insured an old man, ninety years old, and he was put in for forty-five years old; and Kramer insured a man walking the streets with consumption, a negro, that died in less than thirty days; and A. A. Hammack insured a man that was paralyzed in his bed, and Dr. Lipscomb examined him."

The contention of the defendant is that had the jury been permitted to construe the article they might have found that the only offense charged against the plaintiff was that he victimized insurance companies by procuring the writing of fraudulent policies. If their attention were confined to the narrative in small type, such a conclusion might have been reached, because Duke is there mentioned by name only in connection with the fraudulent insurances, although the narrative, considered as a whole, might be taken as fairly importing that Duke was one of the "others in the conspiracy"—one of the "beneficiaries by the frequent mysterious deaths" which had been brought about by

poison. But the jury would not have been justified in confining their attention to the small-print narrative; the headings were equally a part of the publication, indeed the more prominent part. They speak with no uncertain sound; they admit of no inferences contrary to their positive and unambiguous language. They assert that some prominent business men of Scooba were incriminated in a horrible conspiracy, that the plotters had murdered many persons for insurance, that there were half a dozen in it, and they give the names of the six, among which is found the plaintiff's. A finding of a jury that this publication did not charge the plaintiff with being implicated with others in the murder of many persons by the administration of poison should be set aside as in flagrant disregard of its plain intent and meaning, and there was no error in the excerpts from the charge above quoted.

2. A witness who had known the plaintiff for some 20 years testified that he was well known in Mississippi, and, upon being asked, "What in July, 1897, was his social and business standing?" replied: "I can only answer as to his business standing from reputation. I know nothing from my own knowledge as to his business standing. He had the reputation of having a fine business standing at that time. As to his social standing, I know that to have been excellent. His business standing I could only say from reputation." Defendant duly objected to the question, and reserved an exception. The admissibility of such testimony in an action for libel is in dispute upon the authorities. The question, however, was carefully considered by this court in Press Publishing Co. v. McDonald, 11 C. C. A. 155, 63 Fed. 238, 26 L. R. A. 53, and decided in the affirmative. The testimony here was closely confined, as in that case we indicated it should be, "to his general social standing, and not extended to minute details of his life," and the exception to its admission is unsound.

3. It is contended that the court erred in excluding testimony of the witness Robinson. This testimony had been taken by deposition, so that the answers as well as the questions are found in the record. It appeared that the narrative part of the libel—that printed in small type—was prepared by Bertrand, a reporter on the paper. Who prepared the headings was not shown. Bertrand testified that he got his information entirely from Robinson, who at the time was the editor of the Meridian Herald; that Robinson showed him some newspaper clippings, some of which he identified, and they were introduced in evidence, one of them being an article published in Robinson's own paper. It may be noted that in this account published in the Meridian Herald, much of which was reproduced in defendant's article, there was printed a "card given to the press" by plaintiff, denying any knowledge or connection with the conspirators. No mention whatever of this card, or of plaintiff's denial, appears in the article complained of—a circumstance which the jury no doubt regarded as quite illuminative of the degree of care with which the libelous article was prepared. Bertrand testified that, in addition to giving him the newspaper clippings, Robinson sketched over the case to him, "gave him some facts"—a "general outline of the case"—and told witness something about his business with the insurance companies." Rob-

inson then testified that he met Bertrand at the time he was leaving for the depot to return to Mississippi; that he gave Bertrand a number of clippings, telling him that witness was in a hurry, and did not have time to go over the case with him, but that he could get out of them what he wanted. The witness added: "He asked me what I had obtained from the insurance companies in New York. I told him I was in a hurry; * * * opened my hand-satchel, and pulled out some memoranda from the insurance companies, and he copied some of it. What he copied I don't know." Thereupon the defendant sought to introduce further testimony of Robinson, which was excluded. The testimony thus excluded was, in substance, that Robinson called on several insurance companies, asked for the Kempner county records and policies, and was shown them; that at the New York Life Company a Dr. Rogers was detailed to assist him, and he spent two hours going over a stack of canceled policies, besides correspondence between the company and its agents, and a confidential report made by Dr. Rogers to the company. He did not state what this examination disclosed.

It was conceded that neither the reporter nor any other of defendant's employés had any personal ill will towards the plaintiff; none of them had ever heard of him before the newspaper clippings were exhibited. The plaintiff sought to prove malice entitling the jury to give exemplary damages solely by showing that the article was published with a wanton and reckless disregard of plaintiff's rights. Defendant was entitled to meet such proof by showing with the utmost fullness everything that was before it connecting the name of the defendant with the acts of which it accused him. It was entitled to show every vestige of evidence, every particle of information, which its reporter had and relied upon when he penned the article. The record shows that defendant was accorded the fullest latitude to make such proof. The documents which the reporter received were all admitted. He was allowed to state, as fully as his counsel chose to ask him, everything that Robinson told him. Robinson was allowed to corroborate him as to everything that passed between them. Except so far as the imperfections of the memory of these two witnesses and the failure of counsel to elaborate the details operated to obscure the recital, the jury had before it a complete and accurate statement of all the information and alleged information which was before defendant when the libel was published. Upon the extent and character of such information the defendant's case in libel suits must stand or fall, because it is always for the jury to say upon such proof whether or not the conduct of the defendant (or of its agent, the reporter) in publishing the libel upon such information was or was not "wanton and reckless." It is the conduct of the defendant's agent that is in question, and it is his environment at the time he acted which is to be shown. The defendant here sought to go much further, and to show that one of the informants of its agent, a person in no way connected with it, and in no way responsible for its decision to publish or refrain from publishing, had himself made an investigation. All statements that such person made to the reporter touching the character and extent of any investigation he had made were competent, but no such statements were excluded.

Defendant, however, was not entitled to have the informant give the details of an investigation he had made, but of which defendant was not informed when it accepted the informant's statements touching the plaintiff as being sufficient proof· to warrant the publication of its article, such details not being before defendant's agents when they made their decision to publish, and were not to be considered by the jury when determining whether such decision was or was not, under all the circumstances, "reckless and wanton." "Only such facts are available in mitigation of damages as were known to the defendant at the time of the publication, and which might have influenced him in making the defamatory statements." Sun P. & P. Co. v. Schenck, 98 Fed. 929, 40 C. C. A. 163; Hatfield v. Lasher, 81 N. Y. 246; Bush v. Prosser, 11 N. Y. 347.

The brief contains the statement that the court "refused to permit Robinson to testify * * * as to what information he gave Bertrand." Not content with the references given on the brief, we have carefully read the entire deposition of Robinson, and find nothing therein nor in the bill of exceptions which supports such statement. The exceptions reserved to excluded testimony of this witness are unsound.

4. The next assignment of error is to the exclusion of the deposition of the witness Sam Williams. The evidence tended to show that Rosenbaum and Lipscomb had made an attempt to poison the negro Williams, who had been insured for Rosenbaum's benefit, and passed by Lipscomb. The evidence clearly ·was not admissible against the plaintiff, Duke.

5. There was no error in excluding the deposition of Reuben C. Jones, which related solely to the indictment, trial, and conviction of Lipscomb. It was not admissible against the plaintiff.

6. It is contended that the court erred in charging as follows:

"It is no defense and does not tend in mitigation of damages that it be shown that the plaintiff has been guilty of other crimes, or has committed other wrongs than those which were imputed to him by the libel. In other words, if a libel charges the plaintiff with the guilt of murder, it is not either by way of defense, or mitigation or reduction of damages, of any value to prove that he was guilty of fraud; and if a man is charged with having procured a policy, or a lot of policies, upon lives with intent to defrauding insurance companies, it is not in the least a defense, or in the least a mitigation of the defendant's conduct in publishing such a libel, to show that he has been guilty of defrauding a fire insurance company."

The charge in this particular was in accord with the rule laid down by this court in Sun P. & P. Co. v. Schenck, 98 Fed. 925, 40 C. C. A. 163, and Tribune Association v. Follwell, 107 Fed. 646, 46 C. C. A. 526. As stated in those opinions, it is nevertheless open to defendant to show the bad character of the plaintiff in any particular, because one whose character is ·bad is not entitled to the same measure of damages as one of unblemished fame. And in the case at bar, referring to evidence which had been introduced to show that plaintiff had undertaken unsuccessfully to effect insurance on the life of practically a dying man, the court charged that, if the jury believed such to be the fact; "it does not prove him a party to a conspiracy with a lot of other scoundrels to defraud New York insurance companies by a series of

insurances, and certainly does not prove that he was a conspirator in a scheme of murder; it does reflect upon his character, and the jury are to take it into consideration." Defendant's counsel apparently does not challenge the general rule referred to in the charge. The brief states that "contention is not made that defendant in a libel suit may, for the purpose of either mitigating or reducing damages, show specific acts of immoral or disgraceful conduct disconnected from the libelous charge." It must be borne in mind that the article complained of charged plaintiff with two different offenses—one, the defrauding of insurance companies by taking out policies in his own favor on lives of old and infirm persons; the other, conspiring with others to poison some of the insured, a conspiracy which had already resulted in the murder of 12 persons. The record shows that the fullest opportunity was given the defendant to show that plaintiff had been engaged in defrauding the insurance companies, and a great deal of testimony was introduced bearing upon that issue. And the court charged: "The truth, however nauseating it may be, is always justification for a libel; and the first inquiry which will arise for your consideration is whether the truth of the defamatory statement has been established. If it has, that is the end of the case, and the defendant is entitled to your verdict." The court, in the excerpt given above, wisely cautioned the jury against accepting this evidence (if they credited it) as justifying the whole libel. The fundamental error of the defendant's argument under this point is disclosed in this sentence from the brief: "The sting of the charge [made in defendant's publication] was victimizing insurance companies by fraud." This is a misconstruction of the libel. As pointed out supra, the most venomous part of the article was contained in the headings and panels, which distinctly charged plaintiff with being at least accessory to the murders of a dozen persons. This part of the court's charge was correct, and under the circumstances of the case was certainly called for.

7. Defendant's last point is that the judgment is for excessive damages, and evidences such a degree of prejudice and passion as to require a new trial. It is contended that the court erred in charging the jury on the subject of exemplary damages that "if the article was published in wanton disregard of the plaintiff's rights, if there were a reckless and wanton publication made without due investigation, that is all the evidence of express malice which it is necessary to show." And other passages are cited from the charge, which it is contended prejudiced the jury against the defendant. It will not be necessary to discuss the argument advanced in support of this point, because none of the passages in the charge which are now criticised were objected to at the trial, and no exceptions reserved, and it is not the province of this appellate court to go into the question whether or not damages are excessive, where no exceptions present errors in trying the cause or in charging the jury.

The judgment is affirmed.