## EXAMINER PRINTING CO. et al. v. ASTON.

(Circuit Court of Appeals, Ninth Circuit. December 4, 1916.)

### No. 2672.

1. LIBEL AND SLANDER ⬅107(3)—ACTIONS—ISSUES AND PROOF—PROFESSIONAL CHARACTER AND REPUTATION.

In an action for libel, it was alleged and shown that plaintiff was employed as a consulting civil engineer to make a survey of the property of a corporation which owned a water supply and a report upon its availability for furnishing a water supply for the city of San Francisco. A bill pending in Congress to grant to the city the right to use a source of water supply within a government reservation was opposed by the corporation, which desired to sell its property to the city, and plaintiff made statements to members as to the quantity of water which could be supplied from the corporation's property. The alleged libelous publication characterized the scheme of the corporation as advocated by its president and plaintiff as a "gross fraud," and in its answer defendant repeated the charge, alleging that the claims of the company as to the available water supply which were based on plaintiff's report were grossly exaggerated. *Held*, that the pleadings put in issue the professional character and reputation for integrity of plaintiff as a civil engineer, as distinguished from his personal character and reputation; and that plaintiff was entitled to introduce evidence in chief in support of his professional character and reputation.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 302, 303; Dec. Dig. ⬅107(3).]

2. LIBEL AND SLANDER ⬅107(3)—ACTIONS—EVIDENCE.

Such evidence was also admissible on the question of damages which was in issue.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 302, 303; Dec. Dig. ⬅107(3).]

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. LIBEL AND SLANDER** &#x269C;&rarr;104(3)—ACTIONS—EVIDENCE.

Other similar publications *held* admissible, in an action for libel, as explanatory of the meaning of the matter charged as libelous in the defamatory publication.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 286, 287; Dec. Dig. &#x269C;&rarr;104(3).]

**4. APPEAL AND ERROR** &#x269C;&rarr;1053(3)—CURE OF ERROR—EVIDENCE—INSTRUCTIONS.

Various rulings of the trial court on the admission of evidence in an action for libel considered, and *held* not erroneous when taken in connection with the instructions to which no objection was made.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4180–4182; Dec. Dig. &#x269C;&rarr;1053(3).]

**5. APPEAL AND ERROR** &#x269C;&rarr;231(3)—REVIEW—ADMISSION OF EVIDENCE—SUFFICIENCY OF OBJECTION.

Where the only objection made to evidence offered was the general one that it was immaterial, irrelevant, and incompetent, a specific objection cannot be considered in the appellate court unless it be of such a character that it could not have been obviated in the trial court.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. &#x269C;&rarr;231(3); Trial, Cent. Dig. § 199.]

In Error to the District Court of the United States for the Second Division of the Northern District of California; William C. Van Fleet, Judge.

Action by Taggart Aston against the Examiner Printing Company and William Randolph Hearst. Judgment for plaintiff, and defendants bring error. Affirmed.

For opinion below, see 226 Fed. 496.

Action at law to recover damages for libel. Judgment for plaintiff. Defendants allege error.

The Sierra Blue Lakes Water & Power Company was the owner of certain water rights on the Mokelumne river in California, which were said to be available and adequate as a source of water supply for San Francisco. In May, 1913, Eugene J. Sullivan and his wife, being the owners of practically all the issued capital stock of this company, executed their power of attorney to Richard Keatinge and his son of San Francisco by which they were empowered to make a sale of the stock at their discretion. Thereafter, these attorneys in fact gave a three months' option to Mr. W. J. Wilsey within which he might make a sale and delivery of the entire property and assets of the company. The plaintiff was employed by Mr. Wilsey as consulting civil engineer to make a survey of the company's property and to prepare notes, maps, profiles, and a report of and concerning the availability of the Mokelumne river sources in the Sierra Nevada Mountains in California. This was undertaken by plaintiff, and the report completed in July, 1913. Mr. Wilsey's option expired by limitation in August, 1913, and with its expiration the plaintiff's direct interest in the property ceased.

In March, 1913, Congress convened in special session, at which time there was presented the application of the city of San Francisco for the grant of reservoir and power privileges at Lake Eleanor, Cherry creek, and in the Hetch Hetchy Valley. This application had prior to that time been pending before the Secretary of the Interior; but, that officer having held that Congress possessed the exclusive power and jurisdiction to grant the privileges sought by the city of San Francisco, the application was transferred to that body. In making the application, San Francisco relied very strongly upon a report made by an Advisory Board of Army Engineers, appointed at the behest of the Secretary of the Interior of the United States to make an investigation of the sources of water supply available for San Francisco as a basis of determining whether or not the Hetch Hetchy privileges should be grant-

&#x269C;&rarr;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ed, which report showed the necessity of including these privileges in order to furnish an adequate water supply.

The Sierra Blue Lakes Water & Power Company, through Sullivan and the plaintiff, actively opposed the Hetch Hetchy Bill, contending that the Board of Army Engineers had been deceived in its findings by the fact that the city of San Francisco, upon which had been enjoined the duty of supplying all necessary data to enable the Advisory Board of Army Engineers to make its determination, had not only been remiss in this duty, but had actually suppressed a report which, according to the claim of the plaintiff and Sullivan, proved that the Mokelumne water rights owned by the Sierra Blue Lakes Water & Power Company were ample as a source of water supply for San Francisco; and charged that the city officials had deliberately suppressed this report.

The alleged libel (the subject of this action) was contained in a special Washington edition of the San Francisco Examiner published in the city of Washington, D. C., on December 2, 1913, when there was pending before the Senate the Hetch Hetchy Bill granting to San Francisco the reservoir and power privileges mentioned. This Washington edition dealt with the water supply question in San Francisco and the needs and necessities of San Francisco in that behalf and urged the granting of the Hetch Hetchy privileges.

One of the articles complained of, entitled "Thief with the Nature Lovers," was signed by Representative Kent of California, and read, in part, as follows:

"I want to state here and now that I have read this literature put out by these people. It has only one foundation in fact and that foundation is the letters of this man Sullivan whom we proved in the hearings in the House to be a thief and a man who ought to be in the penitentiary."

Another was entitled "Inspiration of Opposition," reading as follows:

"During the Senate Committee hearing it came out that much of the inspiration for gross and careless aspersions made on the city of San Francisco, the Army Engineers and engineers generally, came from two men named Sullivan and Aston, who had pretended to have an opposition water supply to sell to San Francisco.

"But at the House hearing it had been so thoroughly developed that the Sullivan-Aston scheme was just a gross fraud that Mr. Johnson (a conservationist who opposed the Hetch Hetchy Bill) got very angry when Sullivan was referred to as his friend, though he admitted receiving information on which he had attacked the Hetch Hetchy project as a bad jobbery from Sullivan's man, Aston."

An amended complaint was filed September 3, 1914, in which it was alleged that by the use and publication of the above language defendants charged and asserted, and were by the readers of the newspaper in fact understood as charging and asserting: (1) That plaintiff was guilty of the fraudulent intent, purpose, and design to combine and conspire with Eugene J. Sullivan to perpetrate a gross fraud upon the city of San Francisco by and through the sale to it of a worthless opposition water supply, and that plaintiff pretended to have such opposition water supply to sell to the city, and that because he pretended with Sullivan to have such opposition water supply to sell to the city he was led to make gross and careless aspersions on the city of San Francisco, the Advisory Board of Army Engineers, and others; (2) that plaintiff had been proved at the hearing before the Committee on Public Lands of the House of Representatives to be guilty of combining and conspiring with Sullivan to perpetrate, and of perpetrating, a gross fraud either upon said committee, or upon the House of Representatives, or upon Congress, or upon the city of San Francisco, or upon some other persons; and (3) that plaintiff was the tool, sycophant, or hireling of Sullivan, and therefore of "a thief" and of "a man who ought to be in the penitentiary," and that as such he would stultify himself and prostitute his personal honor and professional reputation to do the servile bidding of such an employer without reference to truth and right, and that he had so demeaned himself and disgraced his profession in a certain course of conduct with one Mr. Johnson (meaning Robert Underwood Johnson of New York City), by lying and misrepresenting

facts in connection with the Hetch Hetchy project at the bidding and behest of Sullivan. It was further alleged: "That said charges so made and published by the defendants and each of them and so understood, and by them and each of them intended to be understood by the readers of said special Washington edition of said 'San Francisco Examiner' were, and are in every particular false, misleading, defamatory, libelous, unprivileged, and without excuse, and that they had a tendency to and did and do expose plaintiff to hatred, contempt and obloquy by imputing to him the basest, meanest and most untrustworthy traits of character as a man, neighbor and citizen and had a tendency to and did and do injure him in his good name, reputation, and business, occupation and profession and that said charge was published and circulated by said defendants and each of them with express malice on the part of each of said defendants, and with the design and intent on the part of each of them to outrage the feelings of plaintiff and to cause him to be shunned and avoided by his fellow citizens, and to destroy his reputation and character for honesty and integrity; and to hold him out to the people of the United States and elsewhere as being devoid of honesty and integrity and by reason of an alleged business association with a man stigmatized as a 'thief' and 'who ought to be in the penitentiary,' as being unworthy of any personal or professional trust or confidence, and to injure him in his good name, reputation, business, occupation and profession."

The answer of the defendant William Randolph Hearst was a general denial except as to admissions that the Examiner Printing Company was a corporation incorporated under the laws of the state of California with its principal place of business in San Francisco, and that the defendant William Randolph Hearst was a resident and citizen of the state of New York and an inhabitant of the city of New York.

The amended answer of the defendant Examiner Printing Company was also a general denial except as to admissions similar to those contained in the answer of the defendant Hearst; and for a further answer the defendant set up matter in defense by way of justification, and also matter by way of defense in mitigation of damages in the event that the plaintiff should be held entitled to recover.

The matter in justification was, in substance, that the plaintiff at the times mentioned in the complaint was in the employment of the said Sierra Blue Lakes Water & Power Company and had an interest in the alleged water rights owned by said company, contingent upon the sale of said water rights to the city and county of San Francisco; that there was a great disparity between the water rights claimed to be owned by the said Sierra Blue Lakes Water & Power Company and the water rights actually owned by it, and between the amount of water claimed to be available therefrom to the city and county of San Francisco in the event it purchased the same and the amount which would actually be available therefrom in the event of such purchase; that the claims of the said Sierra Blue Lakes Water & Power Company and its president were at all of said times grossly exaggerated, and that said scheme and effort of that company and its president to sell said water rights to the city and county of San Francisco was at all the times mentioned a gross fraud, in the sense that the claims of said company and of the said president were grossly exaggerated, and that there was a great disparity between the water rights claimed to be owned by the said company and the rights actually owned by it and between the amount of water claimed to be available therefrom and the amount actually available.

The matter set up in defense in mitigation of damages was, in substance, that prior to the publication of the article set up in the complaint the defendant had been informed that the plaintiff had asserted that the cost of developing a supply on the Mokelumne river would be "much less than that of the Hetch Hetchy project"; that defendant had been further informed that other competent engineers had reported unfavorably upon the claims of the Sierra Blue Lakes Water & Power Company; that defendant had been further informed that plaintiff had stated that he had prepared, instigated, and was responsible for all statements and charges made by the president of the Sierra Blue Lakes Water & Power Company in his telegrams to the Public Lands Committee of the House of Representatives, and that plaintiff in a

telegram dated June 14, 1913, to William Kent, a member of the House of Representatives, and iñ another telegram dated June 23, 1913, to the Chairman of the Public Lands Committee of the House of Representatives, had stated that he had been appointed Consulting Engineer by the Sierra Blue Lakes Water & Power Company; that defendant had been further informed that the chairman of the Advisory Board of Army Engineers had stated in a letter to the Honorable William Kent that the board believed that an estimate of 128,000,000 gallons daily was about all that could be counted on from Mokelumne river unless existing water rights were purchased at great expense and unless the land tributary to the river were deprived of water from this source for irrigation; that defendant had been further informed that, as against this finding of the Advisory Board of Army Engineers, the plaintiff had reported to the chairman of the Public Lands Committee of the House of Representatives that 350,000,000 gallons daily of pure water could be economically supplied to San Francisco from said Mokelumne river, and that the taking of the same would not conflict with any irrigation interests. The defendant further alleged that, in the article in question, where it charged that the Sullivan-Aston scheme was a gross fraud, it did not intend to charge or assert that the Sierra Blue Lakes Water & Power Company or the said Sullivan or the said Aston were knowingly engaged in the perpetration of a gross or any fraud, but intended merely to charge and assert that by reason of the disparity between the claims of the company and of Sullivan and Aston and the findings of the Advisory Board of Army Engineers and other competent engineers, and the Committee on Public Lands of the House of Representatives, said scheme was objectively a gross fraud.

The case was tried before the court and a jury, resulting in a verdict and judgment against both defendants and in favor of plaintiff in the sum of $2,800 as compensatory damages.

Defendants allege error in the admission of certain evidence.

Garret W. McEnerney, of San Francisco, Cal. (John J. Barrett and Andrew F. Burke, both of San Francisco, Cal., of counsel), for plaintiffs in error.

Jacob M. Blake, of San Francisco, Cal., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above).   [1] 1. This action was brought by the plaintiff to recover damages from the defendants for the defamatory publication set out in the statement of facts.  It is alleged in the amended complaint that the publication was made with "the design and intent," among other things:  (1) To destroy plaintiff's "reputation and character for honesty and integrity; and (2) to hold him out to the people of the United States and elsewhere as being devoid of honesty and integrity and by reason of an alleged business association with a man stigmatized as a 'thief' and 'who ought to be in the penitentiary';  (3) as being unworthy of any personal or professional trust or confidence;  and (4) to injure him in his good name, reputation, business, occupation, and profession."  The answer of the defendant Hearst and the amended answer of the defendant Examiner Printing Company denied all of the allegations of the amended complaint save such allegations as were therein expressly admitted.  The allegations referred to above were not admitted, and therefore became issues in the case requiring proof to establish them as facts supporting the cause of action.  The burden of proof was on the plaintiff to prove the material facts in his complaint not admitted by the defendants' answers.

Section 2053 of the California Code of Civil Procedure provides as follows:

"Evidence of the good character of a party is not admissible in a civil action * * * until the character of such party * * * has been impeached, or unless the issue involves his character."

The plaintiff came into court with his general good character established by the statute, and it may be conceded that the statute was sufficient for that purpose, and that evidence was not admissible upon that issue, until the character of plaintiff had been impeached or put in issue by the answers. We think that all the allegations of the complaint relating to the character of the plaintiff for honesty and integrity were placed in issue by the answers, but we pass the question of the plaintiff's general character (clauses 1 and 2 of the allegations of the complaint, as above stated) without comment, to take up the question of the plaintiff's professional character (clauses 3 and 4 of the allegations of the complaint, as above stated), which was manifestly the character of plaintiff involved in the defamatory publication. Let us make this perfectly clear.

In the complaint, the publication is charged as referring to "the statement of the plaintiff and the said Sullivan that the said Mokelumne sources of water supply were reasonably available and adequate for all present and reasonably prospective needs of said city of San Francisco and the adjacent bay cities." This was not the statement of an ascertained fact upon which personal veracity could be made an issue, but was a professional statement, based upon professional skill, and whether it was to be accepted as true or not would necessarily depend upon the plaintiff's professional character and his reputation for truth and veracity as an engineer.

The published article then proceeds to impeach the plaintiff's professional integrity by the charge that:

"It (the statement) has only one foundation in fact, and that foundation is the letters of this man Sullivan, whom we proved in the hearings in the House to be a thief and a man who ought to be in the penitentiary."

The publication contained the further charge:

"During the Senate Committee hearing it came out that much of the inspiration for gross and careless aspersions made on the city of San Francisco, the army engineers and engineers generally, came from two men named Sullivan and Aston, who had pretended to have an opposition water supply to sell to San Francisco.

"But at the House hearing it had been so thoroughly developed that the Sullivan-Aston scheme was just a gross fraud that Mr. Johnson got very angry when Sullivan was referred to as his friend, though he admitted receiving the information on which he had attacked the Hetch Hetchy project as a bad jobbery from Sullivan's man, Aston."

That the question at issue was the plaintiff's professional good name, reputation, and character for honesty and integrity as an engineer, as distinguished from his personal character as an individual, is further made plain by the amended answer of the defendant Examiner Printing Company in the matter set up as a defense by way of justification. In this answer it is alleged that there was a great disparity between

the water rights claimed to be owned by said Sierra Blue Lakes Water & Power Company and the water rights actually owned by it, and between the amount of water claimed to be available therefrom to the city and county of San Francisco, in the event it purchased the same, and the amount which would actually be available therefrom in the event of such purchase; that the claims of the Sierra Blue Lakes Water & Power Company were at all of said times grossly exaggerated; and that said scheme and effort of said company to sell said water rights to the city and county of San Francisco was at all of the times mentioned a gross fraud, in the sense that the claims of said company were grossly exaggerated, and that there was a great disparity between the rights claimed to be owned by said company and the rights actually owned by it, and between the amount of water claimed to be available and the amount actually available. The claim of the company here attacked was based upon the report of plaintiff as an engineer, and whether this report was worthy of belief or not depended upon his character as an engineer for honesty and integrity.

In the amended answer of the defendant Examiner Printing Company setting up matter in defense by way of mitigation of damages, the report of the plaintiff was brought forward to impeach his professional reputation and character for honesty and integrity on the charge that he had reported to the chairman of the Public Lands Committee of the House of Representatives that 350,000,000 gallons daily of pure mountain water could be economically supplied to the city and county of San Francisco from the said Mokelumne river without conflicting with any irrigation interests; whereas, the defendant had been informed that competent engineers, whose names are given in the answer, had reported unfavorably upon the claims of the company, and that the chairman of the Advisory Board of Army Engineers had stated that the estimate of 128,000,000 gallons daily was about all that could be counted on from the Mokelumne river unless existing water rights be purchased at great expense and unless the land tributary to this river be perpetually deprived of water from this source for irrigation. Whether this project would supply to the city and county of San Francisco 350,000,000 gallons of pure mountain water daily, or whether it would supply only 128,000,000 gallons daily, was a question to be determined by the professional skill of an engineer; and whether Congress would accept one or the other of these estimates would necessarily depend upon the character of the engineer making the estimate. If his professional character for honesty and integrity was good, his estimate might receive favorable consideration; if it was not good, it would be rejected as unworthy of consideration. It was in this situation of the controversy that the publication appeared in the defendants' paper. It could have but one effect, and that was to impeach the plaintiff's professional character for honesty and integrity, and that it was so intended is distinctly stated by the defendant in its answer that, in the article in question where it charged that the Sullivan-Aston scheme was a gross fraud, it did not intend to charge or assert that the Sierra Blue Lakes Water & Power Company or the said Sullivan or the said Aston were knowingly engaged in the

238 F.—30

perpetration of a gross or any fraud, but intended merely to charge and assert that, by reason of the disparity between the claims of the company and of Sullivan and Aston and the findings of the Advisory Board of Army Engineers and other competent engineers and the Public Lands Committee of the House of Representatives, said scheme was objectively a gross fraud.

We find, then, from the pleadings, that a distinct issue was presented as to plaintiff's professional character and as to the truth and veracity of his reports as an engineer, and upon that issue the burden was upon the plaintiff. The plaintiff, to prove his case against the defendants, offered in evidence the deposition of one William J. Wilsey, who testified that he had employed the plaintiff to make an engineering report upon the hydroelectric and irrigation project in California known as the Sierra Blue Lakes Water & Power Company. A report and supplemental report were made to the witness by the plaintiff for use exclusively in making a sale in Europe. The witness was then asked this question:

"Q. 18. State whether or not you know the general reputation of Taggart Aston in the engineering world, meaning thereby among consulting engineers and among construction engineers and those engaged in promoting and constructing engineering projects in this country and in Europe, or in either of said countries, for the truth and veracity of his reports as a consulting engineer."

The question was objected to as immaterial, irrelevant, and incompetent. The court overruled the objection, and the witness answered: "Yes, I do." The witness was then asked:

"State what Mr. Aston's reputation is in the particulars inquired about in interrogatory No. 18, in any or all of the quarters aforesaid."

The question was objected to as immaterial, irrelevant, and incompetent. The court overruled the objection, and the witness answered:

"From all the information that I have been able to secure regarding Mr. Aston, both in America and in Europe, his reputation has been first-class."

The defendant contends that the admission of this testimony offered by the plaintiff in support of his case in chief was error under the provisions of section 2053 of the California Code of Civil Procedure, supra, and cites Davis v. Hearst, 160 Cal. 143, 185, 116 Pac. 530, 548, where the Supreme Court of California, speaking through Mr. Justice Henshaw, said:

"The court allowed evidence upon the hearing of plaintiff's case in chief to the effect that he bore a good reputation. That affirmative evidence of good reputation in advance of any attack upon it by defendant is inadmissible, is supported by a practical unanimity of authority"—citing numerous cases.

There is no question but that the law of the state is here correctly stated; but, as we think, we have clearly shown it does not meet the issue in the present case, where the plaintiff's professional character was involved and the truth and veracity of his reports as a consulting engineer had been put in issue by the defendants' answers. In this aspect of the case, we think the testimony was clearly admissible.

[2] 2. But there is another ground for admitting this testimony: The plaintiff alleged in his complaint that he had been damaged by this publication, and the general denial of the defendants in their answers placed the question of damages in issue. · In Turner v. Hearst, 115 Cal. 394, 398, 47 Pac. 129, 130, the action was for damages for libel. The publication purported to be an account of difficulties existing between Lotta, an actress, and Turner, the plaintiff, who was a lawyer. In the account it was stated that Lotta had caused Turner's arrest upon a criminal charge, and that "the case was compromised, together with the settlement of several thousand dollars in notes, given by the Plumas county lawyer to the actress." In that case, Mr. Justice Henshaw, speaking for the court and referring to evidence of plaintiff's standing in his profession, said:

"It was not error for the court to allow proof of the extent of plaintiff's practice. Plaintiff was a lawyer engaged in the practice of his profession. The words of the publication being admittedly libelous per se, and affecting plaintiff's standing in his profession, it was proper for the jury, in estimating the general damages to which plaintiff was thus entitled, to know his position and standing in society, and the nature and extent of his professional practice. 'General damages,' in an action where the words are libelous per se, are such as compensate for the natural and probable consequences of the libel, and certainly a natural and probable consequence of such a charge against a lawyer would be to injure him in his professional standing and practice."

In Press Pub. Co. v. McDonald, 63 Fed. 238, 242, 11 C. C. A. 155, 26 L. R. A. 53, Judge Lacombe, for the Circuit Court of Appeals for the Second Circuit, reviews the authorities upon this question and holds that in a civil action for libel plaintiff's social standing may be shown in the evidence in chief as bearing on the question of damages; and in Morning Journal Ass'n v. Duke, 128 Fed. 657, 661, 63 C. C. A. 459, the same court followed its previous decision, holding that in a libel suit it was not error to admit evidence of plaintiff's reputation as to his social and business standing. In the first case, the court cites Foot v. Tracy, 1 Johns. (N. Y.) 52, where Chief Justice Kent, discussing this question, said:

"In assessing the damages, the jury must take into consideration the general character, the standing, and estimation of the plaintiff in society; for it will not be pretended that every plaintiff is entitled to an equal sum for the worth of character. The jury have, and must inevitably have, a very large and liberal discretion in apportioning the damages to the rank, condition, and character of the plaintiff; and they must have evidence touching that condition and character, so as to have some guide to their discretion."

In that case, Mr. Justice Thompson said (1 Johns. p. 47):

"It cannot be just that a man of infamous character should, for the same libelous matter, be entitled to equal damages with the man of unblemished reputation; yet such must be the result unless character be a proper subject of evidence before a jury. * * *

"As the legal intendment is that the action is brought to repair an injury done to a person's character, in the estimation of the public, the jury must be left very much in the dark in making a just reparation in damages without being furnished with some data by which to estimate its value and susceptibility of injury. Though the inquiry into general character may be, in some measure, vague and uncertain, and in some cases may lead to abuses, yet I have adopted it as being the least objectionable course. Such inquiries

may be legally made of witnesses as to enable the jury justly to appreciate the sources from which they form their opinion of the general character of a party, and thereby prevent very great evil or imposition."

The appellant contends that the law of these cases is not applicable to the present case for the reason that there is a distinction between social standing and general reputation; but we are unable to distinguish any substantial legal distinction that would admit testimony concerning the reputation of the plaintiff in his social standing and exclude testimony concerning the reputation of the plaintiff in his professional standing. We do not think there is any such distinction, and we are of opinion that the evidence was admissible upon the question of damages.

[3] 3. Plaintiff, for the purpose of proving matter alleged in the complaint by way of inducement as an explanatory introduction to the main allegations of the complaint, offered in evidence copies of the Arizona Gazette of July 7, 1913, the Evening World-Herald of Omaha, Neb., of July 7, 1913, and the Herald Republican of Salt Lake City, of July 8, 1913, containing articles of the same general character relating to charges made by Sullivan, president of the Sierra Blue Lakes Water & Power Company, before the House Public Lands Committee, of chicanery, suppression of report, and political bias of the engineers in the interest of the Hetch Hetchy project for supplying San Francisco with water. It was objected that the articles were immaterial, irrelevant, incompetent, and hearsay. They were admitted over the objection of the defendants. It was stated by the plaintiff that they were introduced in evidence to explain to the court and jury the meaning of the matter charged as libelous in the defamatory publication, which they did. The articles had no prejudicial bearing upon the defendants' case and had no reference to the truth or falsity of the alleged libel. For example, in the publication under the heading, "Thief with the Nature Lovers," there was the following statement attributed to a Congressman:

"I want to state here and now that I have read this literature put out by these people. It has only one foundation in fact, and that foundation is the letters of this man Sullivan, whom we proved in the hearings in the House to be a thief and a man who ought to be in the penitentiary."

The "literature put out by these people" and the "hearings in the House" are both explained by way of inducement in the articles admitted in evidence; but this explanation did no more than make the charge intelligible to the court and jury. We see no objection to the evidence.

[4] 4. C. E. Grunsky was produced as a witness on behalf of the defendant. He testified on direct examination: That he was a civil engineer who had practiced his profession since 1878; that during the years 1912 and 1913 he was asked by the board of supervisors to take charge of work that had been in progress in the city engineer's office by Mr. Manson, who was then city engineer, and who by reason of illness was for a time incapacitated; that in connection with this work he was asked by Mr. Freeman, who had been called in to take charge of the water supply investigation of San Francisco,

to make a number of studies relating to quite a number of sources of supply, Eel river, Feather river, Yuba river, Stanislaus river, Mokelumne, and others, as various possible sources of water, indicated by the Board of Army Engineers to the city as desirable of investigation; that he made use of the information that was in the city engineer's office, put a number of assistants at work, and gathered the information together, formulated reports upon these various sources of supply, and finally submitted them to the Army Engineers; that his investigation included what is known as the Mokelumne river and the properties of the Sierra Blue Lakes Water & Power Company.

Upon cross-examination this witness was asked when this report was turned in. The question was objected to by the defendant, which objection was overruled, and the witness answered: "The report was delivered very late." It appears that the report included a statement of the run-off from Alameda creek proper of the Spring Valley Water Company, then supplying water to San Francisco, but the report was not in fact submitted to the Advisory Board of Army Engineers. It was, however, brought out at a hearing before the Secretary of the Interior upon the complaint of a representative of the Spring Valley Water Company that there was such a report in existence. It was objected to this 'evidence that the letters and telegrams of Sullivan and plaintiff to the House Committee of Congress claimed that a report prepared by Assistant Engineer Bartell had not been delivered to the Board of Army Engineers, and that it was because of the charge that this last report had been suppressed that defendants charged the plaintiff and Sullivan with having made gross and careless aspersions on the city of San Francisco. But the defamatory publication was not so limited. The charge was general, and the subject-matter was general. The question was whether the city had submitted all of the data that was available to enable the Board of Army Engineers to determine all the sources of water supply sufficient for the present and reasonably prospective needs for the city of San Francisco and the adjacent bay cities. The Spring Valley Water Company was then engaged in supplying San Francisco with water, and the run-off of Alameda creek was a source of supply for that company.

The question was pointedly developed when the plaintiff called in rebuttal the witness William Bade, who was present at the hearing before the Secretary of the Interior and who was asked whether or not at that hearing anything came out with reference to the suppression of any engineering reports which had been prepared for or on behalf of the city of San Francisco. The question was objected to by the defendants as extending the scope of the inquiry beyond the alleged suppression of the Bartell report. The court, in passing upon this objection concerning the admissibility of this testimony, said:

"But this is the situation: The question here is whether this Bartell report was suppressed; your witnesses have all testified that they afforded to that Army Board—because that board represented the Secretary of the Interior—all of the data that was available for the purpose. If it should appear in rebuttal that some data was suppressed, the jury would not be bound by their statements that they afforded all that was material in the matter of the Bartell report."

The testimony, we think, was properly admitted as tending to show that there was a suppression of data which should have been submitted to the Board of Army Engineers to enable that board to perform its duty.

5. The plaintiff charged in his amended complaint that the defamatory matter had been published by the defendants with express malice. As tending to prove this charge, plaintiff introduced in evidence the testimony of three witnesses who, on November 5, 1913, at a meeting of the Civic Center League held in the St. Francis Hotel in San Francisco to discuss the Hetch Hetchy water supply, heard the plaintiff make a speech in which he charged the suppression of the Bartell report; and testified that M. M. O'Shaughnessy, the city engineer, was present and stated that Bartell was merely one of 150 assistants. He appears to have been silent as to the truth of the charge. The copy of the Examiner of November 6, 1913, containing an account of the proceedings of the Civic Center League meeting, was introduced in evidence, from which it appeared that plaintiff's name was not mentioned in the article, nor were any of his statements reported or referred to. The defamatory article was published in Washington on December 2, 1913, or less than a month later than the Civic Center League meeting and the report of its proceedings by the San Francisco Examiner on November 6, 1913. It is contended that the omission from the San Francisco Examiner of any reference to plaintiff's statements before the Civic Center League upon a matter of such vital importance in the investigation tended to prove malice on the part of the defendants. But whether it did, or not, does not now appear to be material. The verdict of the jury was for compensatory damages only, which, under the carefully prepared instructions of the court to which no objection was taken, was in effect a finding against the plaintiff that the publication was actuated by malice; or, in other words, the finding of the jury was in effect a specific finding that the publication was without malice. We do not think there was error in admitting the testimony; but, if there were, it would not now justify the court in reversing the judgment.

6. The plaintiff introduced in evidence, over the objection of the defendants, testimony of William J. Wilsey to the effect that the plaintiff was in his employ, and that the reports made by the plaintiff to the witness concerning the properties of the Sierra Blue Lakes Water & Power Company were not made for the purpose of selling the properties to the city of San Francisco, but for offering them for sale in Europe. It was charged in the article complained of that it had come out in the hearing before the Senate Committee that much of the inspiration for gross and careless aspersions made on the city of San Francisco, the Army Engineers, and engineers generally, came from two men named Sullivan and Aston who had pretended to have an opposition water supply to sell to San Francisco, and that it had been thoroughly developed at the House hearings that the Sullivan-Aston scheme was just a gross fraud. The testimony was relevant to that issue and to the questions arising from the inference to be drawn from the charge against the plaintiff.

7. The court permitted the witness Sullivan to testify, over the objection of the defendants, that he had expended on the property of the Sierra Blue Lakes Water & Power Company in construction and other works about $100,000. This testimony tended to prove that the property was of substantial value, and that it was not a gross fraud, as charged in the publication.

8. It is objected on behalf of the defendant Hearst that there was no evidence connecting him with the publication complained of. In the course of the trial, the plaintiff offered in evidence the article in the San Francisco Examiner of November 30, 1913. The article was headed:

" 'Examiner' to Publish Water Bill Edition in Washington. Hetch Hetchy Measure to Have Support of Special Issue Printed and Circulated Tomorrow Throughout the East. Stupendous Task is Result of Idea Conceived by W. R. Hearst and Carried Out by Him and Able Staff of Lieutenants."

The article commences with the statement:

"Under the personal supervision of Mr. William R. Hearst a special sixteen-page edition of the San Francisco 'Examiner' will be printed and published in Washington to-morrow."

This statement was substantially repeated in other places in the article. It was objected by counsel for the defendant that this statement in the Examiner did not bind the defendant Hearst. The objection was overruled by the court, with the statement that the article was "admissible with respect to one of the defendants" (the Examiner Printing Company). "The other," said the court, "is to be governed by an instruction, which the jury may understand now, that the statements therein, unless there is something to show that Mr. Hearst is connected with this fellow defendant in some manner, the jury will confine its consideration of this article to the other defendant." At the close of the case, no request was made on behalf of the defendant Hearst to instruct the jury to find for the defendant on the ground that there was no evidence connecting him with the publication, and no argument was made to the jury on behalf of either defendant. The court, in its instructions to the jury, referring to the defendant Hearst, said:

"As to the defendant William Randolph Hearst, the first question for the jury will be whether he made or was responsible for the publication of the article in question; and if you find that he either advised, directed, or instigated the publication, then he is responsible for it the same as if he himself had made it. If you find him responsible for the publication, then the question will be, as with the other defendant, whether the statements published were true. If they were true, there is no ground of recovery; if they were false, then, as with the other defendant, he would be responsible for such damages as the jury may award against him. Whether he is responsible for the publication may be made to appear either by direct evidence of the fact or by circumstances warranting the inference of such fact. As to both defendants, the burden is upon the plaintiff to make out this case entitling him to recover by a preponderance of the evidence; that is, by evidence which satisfies the jury that to some extent it is stronger and more satisfactory as a basis of their verdict than that which is opposed to it."

No exception was taken to this instruction of the court. If this instruction was not justified by direct evidence of the fact or by

circumstances warranting the inference of such fact, the attention of the court should have been called to it at that time. Failing to do so, it must be presumed that there was direct evidence of the fact or circumstances warranting the inference of such a fact, and that the question was properly submitted to the jury for its consideration.

[5] 9. The court admitted, over the objection of the defendants, certified copies of sworn statements required by the Act of Congress of August 24, 1912, to be filed with the Postmaster General by the editor, publisher, business manager, or owner of every newspaper, magazine, periodical, or other publication, setting forth the names and post office addresses of the editor and managing editor, publisher, business manager and owner of such publication. 37 Stat. 553, c. 389. In these statements the name of William Randolph Hearst is the only name given as the owner holding more than one per cent. of the total stock of the San Francisco Examiner, the Los Angeles Examiner, the Atlanta Georgian, the Chicago Evening American, the Boston American, and the New York Evening Journal. The purpose for which these certificates were offered in evidence was stated by counsel for the plaintiff to be to show the connection of the defendant William Randolph Hearst with those newspapers. The objection is now made that the evidence showing that the defendant William Randolph Hearst was a stockholder in the defendant corporation in no manner tended to prove that he was directly or even remotely connected with the publication complained of. This objection is made here for the first time. We think it comes too late. It should have been made in the court below. The objection that the testimony was immaterial, irrelevant, and incompetent, was the only objection made in that court. The attention of the court should have been called to the specific objection now urged upon the court against these certificates, so as to give the other side full opportunity to obviate it at the time, if under any circumstances that could have been done.

In Wood v. Weimar, 104 U. S. 786, 795, 26 L. Ed. 779, the objection to a deed read in evidence in the trial court was that it was incompetent, immaterial, and irrelevant. In the Supreme Court it was objected that the attestation of the recorder of deeds of the correctness of the transcript was not certified to be in due form. Chief Justice Waite, for the Supreme Court, said:

"This was not the objection made below, and it comes too late here. There the attention of the court was called only to the competency, materiality, and relevancy of the deed; here to the form of the authentication of the copy. The rule is universal that nothing which occurred in the progress of the trial can be assigned for error here, unless it was brought to the attention of the court below."

In Noonan v. Caledonia Mining Co., 121 U. S. 393, 400, 7 Sup. Ct. 911, 915 (30 L. Ed. 1061), Mr. Justice Field, for the court, said:

"The rule is universal that where an objection is so general (immaterial, irrelevant, and incompetent) as not to indicate the specific grounds upon which it is made, it is unavailing on appeal, unless it be of such a character that it could not have been obviated at the trial. The authorities on this point are all one way. Objections to the admission of evidence must be of such a

specific character as to indicate distinctly the grounds upon which the party relies, so as to give the other side full opportunity to obviate them at the time, if under any circumstances that can be done."

In District of Columbia v. Woodbury, 136 U. S. 450, 10 Sup. Ct. 990, 34 L. Ed. 472, Mr. Justice Harlan announces the same rule.

"It has therefore been often held," said Mr. Justice Harlan for the court in Sparf & Hansen v. United States, 156 U. S. 51, 57, 15 Sup. Ct. 273, 275 (39 L. Ed. 343), "that an objection to evidence as irrelevant, immaterial, and incompetent, nothing more being stated, is too general to be considered on error, if in any possible circumstances it could be deemed or could be made relevant, material, or competent."

Under these authorities, the objection made by counsel for the defendants is not sufficient with respect to the evidence in question.

Finding no error in the record, the judgment of the court below is affirmed.