# Clark, Appellant, *v.* North American Company.

*Libel—Variance in name—Description of person—Charge.*

If a libel is so worded that it may naturally or probably be taken to refer to the plaintiff it is actionable by him though he is not named or even is called by a different name.

In an action for libel against a newspaper by one James Clark, where the article, admitted to be false and libelous per se, refers to one John Clark who is described by plaintiff's occupation, official position, locality, etc., the court should call the jury's attention to the fact that the name used in the article did not refer to the plaintiff, but to one John Clark, a different person, but that on the other hand, the description pointed directly to the plaintiff, and the jury should consider the whole article and determine from all the evidence whether, notwithstanding the difference of name, the description was such, either intentionally or by want of due care and diligence in ascertaining the true facts, that there would be a natural and reasonable inference that the plaintiff was the person referred to, and if there would be, that the defendant is liable.

*Libel—Evidence—Irrelevant matter.*

In an action for libel, questions which tend to elicit the fact that plaintiff's brother is being sought for by the police, are irrelevant and inadmissible, inasmuch as they have no bearing on the case, except to prejudice the jury against the plaintiff.

*Libel—Other publications—Evidence.*

In an action against a newspaper for libel, accounts of the same transaction in other newspapers are not admissible in evidence for any purpose.

*Evidence—Reputation—Rebuttal—Attack on reputation by cross-examination.*

A plaintiff in a libel case is entitled to give evidence of his good character or reputation after the defendant has attacked it, and it is immaterial whether the attack has been by direct evidence on the subject, or by slurs and insinuations thrown into the jury box by abuse of cross-examination.

*Libel—Punitive damages—Refusal to retract—Evidence.*

In an action against a newspaper for libel, evidence of the refusal or neglect to publish a retraction as to plaintiff after he had called defendant's attention to the injustice done him, is itself sufficient to sustain a verdict for punitive damages; and in this connection the tone and wording of the article itself as indicative of a desire to make a sensation or to hit at parties higher in station, over plaintiff's head, regardless of the effect on him, are open for the consideration of the jury.

*Newspapers—Malice—Act of April 11, 1901, P. L. 74.*

Where a libelous article refers to a person named, or is so written that it will reasonably be taken to refer to him, it establishes legal malice within

the meaning of section 3 of the Act of April 11, 1901, P. L. 74.  The act has not made any change in the law in this respect.

If an article is libelous per se and is false as to the plaintiff, malice is shown and the burden of defense is upon the defendant.

Submitted Jan. 22, 1902.  Appeal, No. 221, Jan. T., 1901, by plaintiff, from judgment of C. P. No. 1, Phila. Co., Sept. T., 1899, No. 487, on verdict for defendant, in case of James Clark v. North American Company.  Before McCollum, C. J., Mitchell, Dean, Fell, Brown, Mestrezat and Potter, JJ. Reversed.

Trespass for libel.  Before Beitler, J.

The article complained of was as follows :

" Watchman charged with burglary, police say he is implicated with a gang of thieves.  Several men arrested who are said to have perpetrated the Spruce Street robberies.

" Closely following the story of the watchman who turned a robber loose in the streets to satisfy a man with a political ' pull ' comes the arrest of another watchman, a city employee, for implication in a burglary.  This special officer, who is believed to have had some hand in the theft of goods from a junk shop, is John Clark, Watchman in Starr Garden Park, Seventh and Lombard Streets.

" Thieves had looted a building at the Southwest corner of the Square, owned by Patrick Hatley, and carried away five hundred panes of glass, with doorknobs, lead pipe and similar articles.

" When the robbery was reported yesterday morning at the Third and DeLancey Streets station Special Policeman Butler went out to find the thieves.  Butler promptly caused the arrest of Clark, who was given a hearing before Magistrate South at the City Hall, and held in $1,000 bail for a further hearing on June 7th.

" On this same date the persons arrested in connection with the burglaries at 1017 and 1019 Spruce Street will have a final hearing.  From what the police have learned of these cases it is believed that the watchman was implicated with others.

" As a result of his investigations Butler last night arrested four other persons.  They were Frank Burke, twenty-two years old, 1338 South Seventh Street; Thomas Dorsey, twenty-two

years old, 440 Lombard Street; William Devitts, twenty-three years old, 620 Christian Street; Hue Mellon, twenty-eight years old of 607 Webster Street.    The men are charged with larceny and will be given a hearing this morning.

" The police are looking for a brother of Clark.    They say he also was concerned.    The police say the men arrested belong to a gang that has been operating in the Southern District."

When James Clark was on the stand as for cross-examination, he was asked in reference to the arrest of his brother Frank, as follows:

" Q. Did you ever hear that he was ?    Did it ever float into your household that Frank Clark was arrested ? "    Objected to, objection overruled, exception for plaintiff. [1]

" Q. Was your brother, Frank Clark, arrested on the 7th, 8th or 9th of June? "    To which plaintiff answered, "I could not tell you."

The defendant's counsel having previously asked plaintiff if some of the stolen goods of Patrick Hatley were not found in the rear of his house, plaintiff had replied that he had heard that some of them were found inside of the fence on the Sixth street side of Starr Garden Park in the neighborhood of where he lived, that he had located some of them and had aided the officers in finding them.

Plaintiff was then asked the question: " Q. James Clark, Jr.    How did it happen that two of the thieves of city property were your brothers, and were located in the rear of your house, and you a watchman there, not know of it? "    Objected to by plaintiff, objection overruled, exception for plaintiff. [2]

" Q. Did not the Public Ledger, The Times and The Inquirer, of the same morning, June 7th, contain a report of the arrest of your brother, John Clark, in which it was said that he was the watchman of Starr Garden Park, and didn't The Telegraph of the same afternoon contain the same report; and haven't you sued The Ledger for the same alleged libel? "    Objected to, objection overruled, exception for plaintiff. [3]

"Q. Answer my question.    Did not the papers that I have named contain the report of the arrest of your brother for this offense, and say he was watchman of Starr Garden Park? A. Yes, sir."

Mr. Ridgway objects on the ground that the papers them-

selves ought to be offered in evidence. Judge Beitler remarked that he thought it was proper on cross-examination to ascertain whether the statement referred to had been made in regard to the plaintiff by other newspapers. Objection overruled, exception for plaintiff. [4]

Elwood Becker being duly sworn, Mr. Ridgway in reply to Mr. Gordon states that the witness is offered to prove the reputation of the plaintiff.

Mr. Gordon objects that evidence of character is not admissible until evidence against character has been introduced.

Objection sustained, the court ruling that the testimony is not competent at this stage. Exception noted for plaintiff. [12]

Plaintiff presented among others the following point:

[10. That the tone, style and falsity of the article, and the failure to publish a subsequent correction, or retraction of the falsity, are circumstances of aggravation, showing wanton, express and unmitigated malice on the part of defendant and the jury may, in awarding damages go beyond simple compensation, and in addition thereto give such exemplary damages as the circumstances of the case may appear to warrant. *Answer:* I believe that I have, in explaining to you the measure of damages, given you the measure with regard to punitive damages. I refer to my charge for this answer to these points.] [28]

Defendant presented among others the following point:

[24. This being a civil action for libel the plaintiff is not entitled to recover any damages unless he has established to the satisfaction of the jury that the publication complained of has been maliciously or negligently made. *Answer:* That is the language of the act of assembly recently passed, and which in my judgment means by malice, legal malice, as I have explained it before.] [31]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–4, 12) rulings on evidence, quoting the bill of exceptions; (28, 31) above instructions, quoting them.

*Thomas Ridgway* and *John J. Ridgway,* for appellant.—Evi-

dence of publications in other papers was irrelevant: Hayes v.
The Press Co., 127 Pa. 642; Neeb v. Hope, 111 Pa. 145.

The error in the first name of the watchman is no defense if
the whole construction of the article applies to plaintiff: Hays
v. Brierly, 4 Watts, 392; Bryant v. Pittsburg Times, 192 Pa.
585; Shelly v. Dampman, 1 Pa. Superior Ct. 115; Moore v.
Leader Pub. Co., 8 Pa. Superior Ct. 152.

There was sufficient evidence to support an award of punitive
damages: Barr v. Moore, 87 Pa. 386; Palmer v. Leader Pub.
Co., 7 Pa. Superior Ct. 594; Collins v. Dispatch Pub. Co.,
152 Pa. 187; Stroud v. Smith & Son, 194 Pa. 502.

*James Gay Gordon*, for appellee.

OPINION BY MR. JUSTICE MITCHELL, October 13, 1902:

This case was unfortunately tried upon a very imperfect view
of the issue involved, and consequently an erroneous application
of the law.    The facts were not really in dispute.    The defend-
ant newspaper published an article headed " Watchman charged
with burglary " etc., and proceeding, " Closely following the
story of the watchman who turned a robber loose in the streets
to satisfy a man with a political 'pull' comes the arrest of an-
other watchman, a city employee, for implication in a burglary.
This special officer, who is believed to have had some hand in
the theft of goods from a junk shop, is John Clark, Watchman
in Starr Garden Park, Seventh and Lombard Streets."    This was
followed by an account of the arrest of Clark and some others
and holding to bail.    Plaintiff was the watchman (officially
known as superintendent) of the Starr Garden Park at Seventh
and Lombard streets, but his name is James Clark, not John.
So far as plaintiff was concerned the article was admittedly
false and libelous per se.    The only suggestion of defense was
that the article did not refer to plaintiff but to one John Clark.
This, therefore, was the real point of contention.

The learned judge submitted the case to the jury as if it was
a question of intention in the writer of the article, and as if the
difference in the names was the deciding factor in that ques-
tion.    Thus in the charge, he said: " Now did that article mean
to assert that this plaintiff here was arrested by Special Officer
Butler, taken before Magistrate South and bound over, or did

it mean what it says, that John Clark was arrested, taken before Magistrate South and bound over? You have nothing at all to do with the question whether the article was true or not as to John. John is making no complaint about that article, and the only question for you to consider is whether The North American article meant this plaintiff." And again, " If that article did not mean this plaintiff, that is the end of the plaintiff's case, and your verdict should be for the defendant. And involved in that question is the other,—the main question in this case, and that is, what was meant. Of course if he was not meant that is the end of the case."

This view similarly expressed runs through the whole charge and the answers to the points. It was not only an inadequate but an erroneous presentation of the case to the jury, on a part and the least important part of the real controversy. Plaintiff admitted that he was not named but his contention was that the person intended to be referred to was so described by occupation, official position, locality, etc., that persons acquainted with the plaintiff and with the Starr Garden Park would naturally and reasonably suppose that the plaintiff was meant, notwithstanding the variation in the first name. What the article meant or intended was only one of the grounds on which defendant's liability might rest. The manner in which it was expressed might so point to plaintiff as equally well to constitute a libel upon him without any actual intention to refer to him at all. Even in reporting an occurrence proper for publication there may be such an absence of the required diligence and care to ascertain the truth as to make the report libelous. See Shelly v. Dampman, 1 Pa. Superior Ct. 115. The mode of presenting the case to the jury made it turn on the intent, and ignored entirely the liability arising from negligent disregard of the injury that might be inflicted upon the plaintiff. If this were the law few persons could ever have legal redress for libels in newspapers, for it is very seldom that any personal malice or intent to injure is the purpose of the publication. The damage that newspapers do, and the outrages they commit, arise from their reckless disregard of private rights in their eagerness for sensation, which amply fills the definition of legal malice.

The passage from the charge first quoted above was also er-

roneous in the form of the question put to the jury, " Now did that article mean to assert that this plaintiff here was arrested . . . . or did it mean what it says, that John Clark was arrested, " etc.   This was unfair to the plaintiff, for while the article does say that John Clark was arrested, it also says that he was the watchman in Starr Garden Park, a description that pointed directly to the plaintiff.   Test it by taking the ·latter clause and supposing the question had been put to the jury, " Did the article mean that one John Clark was arrested, or did it mean what it says, that the watchman at Starr Garden Park was arrested," and the defendant clearly would have had reason to complain that the charge laid the weight of emphasis on the part of the article unfavorable to it.   In Hays v. Brierly, 4 Watts, 392, Chief Justice GIBSON said, " If a slight change in the name were to shield a slanderer from legal animadversion, every man, however clumsy his invention, might securely libel his neighbor at pleasure."   The variation in the names was not the controlling feature in the present case, and should not have had undue prominence.   The proper way to submit it to the jury was to call their attention to the fact that the name used in the article did not refer to the plaintiff, but to one John Clark, a different person, but on the other hand, the description pointed directly to the plaintiff and the jury should consider the whole article and determine from all the evidence, whether, notwithstanding the difference of name, the description was such either intentionally or by want of due care and diligence in ascertaining the true facts, that there would be a natural and reasonable inference that the plaintiff was the person referred to.   If there would, the defendant was liable.

It is not necessary to discuss the very numerous assignments of error in detail, but a few may be noticed to avoid recurrence on another trial.

The first and second assignments must be sustained.   The questions about plaintiff's brother, for whom it was said the police were looking, had nothing to do with the case and should not have been permitted.   They were not relevant to the issue and had no bearing on it except to prejudice the jury against the plaintiff.

All the assignments in reference to the accounts of the same transaction in other newspapers are sustained.   Such accounts

were not admissible in evidence for any purpose: Pease v. Shippen, 80 Pa. 513.

The general rule is that the plaintiff is not entitled to give evidence of his good character or reputation until the defendant has attacked it. The reason is that character and reputation are presumed to be good, and that such presumption prevails until attacked. In Petrie v. Rose, 5 W. & S. 364, it is said the defendant gave evidence "tending to cast an imputation upon plaintiff's character," though the report does not show just what the nature of the evidence was. The trial judge permitted plaintiff in rebuttal to show good character, and this was affirmed. In Chubb v. Gsell, 34 Pa. 114, this ruling was disapproved rather hastily as having been "a minor question in the case and ruled without much consideration." But the criticism does not seem to be well founded. The point in Chubb v. Gsell was that when defendant in mitigation of damages and to disprove malice had given evidence of circumstances that awakened suspicion, he had not thereby made such direct attack as opened the door to evidence in support of plaintiff's good character. There is no real conflict in the two cases. The rule, as already said, is that there must first be an attack on the reputation, and until then, the presumption is sufficient. But the attack may be just as direct and just as damaging by slurs and insinuations thrown into the jury box by abuse of cross-examination, as by calling witnesses under a definite offer. In such cases the result is the same, and the plaintiff should have the same opportunity to protect himself. How far there has been a direct attack may depend on manner and emphasis as well as on the words used, and therefore, it is a matter to be left largely in the discretion of the trial judge. But he should bear in mind that it is the fact of the attack, rather than the manner of it, that entitles plaintiff to protect himself. Defendant in mitigation of damages may show that plaintiff's reputation is bad, but he should accept the responsibility with the privilege and should not be permitted under guise of cross-examination to make what is in effect a direct attack, without affording plaintiff the opportunity of reply. In the present case the appellant, after the cross-examination, should have been allowed to show that he had a trade and had worked at it honestly, and that his reputation was good.

There was evidence in the case on which the jury might have found punitive damages, and it was error to take that matter away from them.    The refusal or neglect to publish a retraction as to plaintiff after he had called defendant's attention to the injustice done him was in itself sufficient, and in this connection the tone and wording of the article itself as indicative of a desire to make a sensation, or to hit at parties higher in station over plaintiff's head regardless of the effect on him, were open for the consideration of the jury.

The Act of April 11, 1901, P. L. 74, has no material bearing on this case.    The learned judge was correct in instructing the jury that the malice required to be shown under section 3 was legal malice, but it would have been fairer to plaintiff if he had also told the jury in plain terms, as the evidence called for, that if the libelous article referred to plaintiff, or was so written that it would reasonably be taken to refer to him, it established legal malice.    The act has not made any change in the law in this respect.    The article being libelous per se and being false as to plaintiff, malice was shown and the burden of defense was upon the defendant.    If the jury found for plaintiff, the statute says, " Such damages may be awarded as the jury shall deem proper."    If this is anything more than declaratory of the previous law, it increases rather than diminishes the control of the jury over the whole subject of damages, punitive as well as compensatory.

Judgment reversed and venire de novo awarded.