PERMAGRAIN PRODUCTS, INC.

v.

U. S. MAT & RUBBER CO., INC.

Civ. A. No. 78–1967.

United States District Court,
E. D. Pennsylvania.

April 24, 1980.

John T. Clary, Philadelphia, Pa., for plaintiff.

Richard H. Elliott, Doylestown, Pa., for defendant.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

Plaintiff, Permagrain Products, Inc., manufactures a vinyl-laminated wood floor covering product, Genuwood, which it advertises as a unique combination of attractiveness and durability. Permagrain contends that an employee of its predecessor in interest learned trade secrets necessary to produce Genuwood, and then revealed this technology to U.S. Mat & Rubber Co., Inc., which proceeded to market Naturwood, a product which Permagrain alleges is quite similar to the original version of Genuwood. Although Naturwood was not widely sold, and is not currently produced, Permagrain contends that if it is marketed the two products will be confused, and that Permagrain will suffer injury because Naturwood is an inferior product likely to have problems after installation, and its bad reputation will carry over to Genuwood. Permagrain seeks to enjoin U.S. Mat from manufacturing Naturwood or any similar product until 1983. U.S. Mat contends that it did not appropriate any trade secrets in producing Naturwood, but rather employed meth-

ods widespread in the art of lamination at that time.

The matter was tried on December 3, 1979. Thereafter the parties submitted requests for findings of fact and conclusions of law, together with briefs on the legal issues. On pleadings and proof, I make the following

## FINDINGS OF FACT

1. Plaintiff is Permagrain Products, Inc., a Pennsylvania corporation with its principal place of business in Pennsylvania, engaged in the manufacture of wood products.

2. Defendant is U.S. Mat & Rubber Co., Inc., a Massachusetts corporation with its principal place of business in Massachusetts, engaged in the manufacture of various floor coverings.

3. Starting in 1976, Permagrain began to manufacture Genuwood, a vinyl-laminated wood floor covering product which is used in high-traffic areas where conventional wood floors ordinarily cannot be used for lack of durability.

4. Permagrain purchased the technology to make Genuwood from ARCO Chemical Company in July, 1976. ARCO Chemical had purchased the technology from General Electric Company in February, 1976, which acquired it when Parkwood Laminates, Inc. became a division of General Electric in 1974.

5. Genuwood is constructed in a series of layers: a top layer of clear vinyl, a second layer of overlapped wood veneer, $1/85$th of an inch in thickness, a third layer comprised of a fiberglass screen, providing dimensional stability, a fourth layer, of vinyl, and a final layer, consisting of a patented bondable surface with a peel-off adhesive over an alpha impregnated cellulose layer.

6. Starting in 1977, U.S. Mat began to manufacture Naturwood, a floor covering product with the same general uses as Genuwood.

7. Naturwood is constructed in a series of layers: a top layer of clear vinyl, a second layer of wood veneer, $1/30$th of an inch thick, the edges of which are glued, five layers of core vinyl, and a back layer of asbestos felt.

8. Victor J. Dossi was an employee of Parkwood, and continued with Parkwood after its takeover by General Electric. He was in charge of quality control for the Genuwood process.

9. When General Electric was negotiating to sell the Genuwood process, Dossi contacted one of the bidders with an offer to work for it and develop a similar product in the event that it did not acquire the rights to Genuwood from General Electric.

10. Dossi left General Electric in September, 1976, and was employed by U.S. Mat & Rubber in March, 1977.

11. Some three to four months later, as a result of Dossi's efforts, U.S. Mat began to manufacture Naturwood.

12. Dossi admits having learned the general methods used to produce Genuwood while working at General Electric, but denies copying or taking any records of a technical nature from General Electric.

13. Lamination of wood and vinyl through the use of pressure and heat was a technique known to the art of plastics lamination in 1977, although the rate of success for this type of lamination was not high.

14. Permagrain's patent for Genuwood claims protection only for the bondable back surface of the product. The patent discloses in some detail the design and the material composition of the product, as well as the method of assembly, including the range of temperatures and pounds of pressure for lamination, but it claimed no patent protection for them.

15. The material composition of the product may also be discovered from Permagrain's advertising, and from the product itself, which can be dissected into its component parts.

16. Both Genuwood and Naturwood involve the lamination of wood and vinyl through heat and pressure. However, aside from the top layer of clear vinyl, there are significant differences in construction. Na-

turwood's top veneer is thicker, and glued together; it has five layers of core vinyl, rather than Genuwood's fiberglass screen; and it has an asbestos backing, rather than Genuwood's patented bondable surface. Furthermore, the lamination processes for each differ in press temperature and pressure.

17. When installed on a floor, the products can be distinguished by the naked eye, in that Naturwood has visible glue lines, whereas Genuwood does not.

18. At least two other companies manufactured similar products in 1977.

19. Several years' experimentation were required before Genuwood was perfected. U.S. Mat had difficulty in perfecting Naturwood, and production of it was discontinued after only a small quantity was manufactured. It is not currently being produced.

20. U.S. Mat never attempted, through its advertising or otherwise, to portray Naturwood as being Genuwood, or to confuse potential consumers of the two products as to the origin of Naturwood.

## DISCUSSION

Permagrain seeks injunctive relief prohibiting U.S. Mat from manufacturing or marketing Naturwood for a period of three years, which it claims is justified on several grounds.

■ First, in its complaint, Permagrain alleged that U.S. Mat violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.Stat.Ann. § 201–1, *et seq.* Section 201–2(4) of the Act prohibits the passing off of goods and services as those of another. Assuming for purposes of argument that the Act is applicable in this case, there is simply no evidence that U.S. Mat ever attempted to pass off its product,

Naturwood, as being the same as or in any way connected with Genuwood. (Finding 20.) It does not follow that, simply because the products have similar uses and a somewhat similar appearance, U.S. Mat is attempting to pass off its product as being the same as Permagrain's product. Furthermore, under Pennsylvania law, Permagrain does not have a private cause of action against U.S. Mat, since the Act limits private suits to goods purchased by consumers for their personal use. 73 Pa.Stat.Ann. § 201–9.2. *See Commonwealth by Packel.v. Ziomek*, 352 A.2d 235 (Pa.Cmwlth.1976).

Permagrain also alleged in its complaint that U.S. Mat has violated the Lanham Act, 15 U.S.C. § 1125(a). Section 1125(a) prohibits a manufacturer from using a false description or designation of origin of a product. As noted above, there simply is no evidence that U.S. Mat did so in the marketing of Naturwood.

■ Permagrain's strongest possible ground for relief is that U.S. Mat wrongfully made use of Permagrain's trade secrets in producing Naturwood. Theft of trade secrets is a common law tort governed by the applicable state law, in this case the law of Massachusetts.[1]

■ "[T]he essence of the wrong is the obtaining of unjust enrichment and unfair competitive advantage through inequitable conduct, usually a breach of confidence. In particular . . . the courts rather consistently impose liability on a proprietor of a business who employs unfair means, characterized by breach of confidence, to acquire otherwise undisclosed plans and specifications for a competitor's distinctive structure or machinery and uses them to produce a similar competitive device for his own use and to his competitor's economic detriment." *Atlantic Wool Combing Com-*

---

[1]. In a diversity action, a federal district court applies the conflicts of laws rules of the state in which it sits. *Midland-Ross Corp. v. Sunbeam Equipment Corp.*, 316 F.Supp. 171 (W.D.Pa. 1970), *affirmed* 435 F.2d 159 (3d Cir. 1970). Under Pennsylvania law, in a tort action, the law of the state which has the most significant relationship with the parties governs. *Griffith*

*v. United Airlines, Inc.*, 416 Pa. 1, 15, 203 A.2d 796 (1964). Here, that state is Massachusetts. U.S. Mat is a Massachusetts corporation, and developed Naturwood there. Moreover, the alleged theft of trade secrets occurred when Victor Dossi worked for one of Permagrain's predecessors in Massachusetts.

*pany v. Norfolk Mills, Inc.*, 357 F.2d 866, 869 (1st Cir. 1966). *Accord, Jet Spray Cooler, Inc. v. Crampton,* —— Mass. ——, 385 N.E.2d 1349 (1979); *Eastern Marble Products Corp. v. Roman Marble, Inc.*, 372 Mass. 835, 364 N.E.2d 799 (1977); *Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 358 N.E.2d 804 (1976). It is settled that manufacturing processes, as much as products and equipment, are protectible as trade secrets. *Eastern Marble, supra.*

By definition, a trade secret must involve a product or technology that is not "public knowledge or of a general knowledge in the trade or business." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). In the instant case, Permagrain has failed to establish that if U.S. Mat made use of the services of Victor Dossi to expropriate technology developed by Permagrain, this technology was otherwise undisclosed. Here, Permagrain publicly disclosed the technology employed in manufacturing Genuwood in three ways. First, in its advertising, Permagrain disclosed the composition of the component parts of Genuwood, including the order in which the layers are laid. (Finding 15.) Second, a sample of Genuwood can be dissected, revealing its component parts. *Id.* The President of Permagrain, Dr. Alvin Witt, admitted at trial that he himself was able to get a general idea of Genuwood's construction before purchasing the rights to it simply by disassembling it. Likewise, using a solvent, he was able to separate Naturwood into its precise component parts. Although Dr. Witt maintains that the exact construction of Genuwood could not be determined through similar means, this testimony was unpersuasive, and it is well-settled that where a product's secret can be determined through "reverse engineering," protection for the product cannot be claimed. *Kewanee Oil Co. v. Bicron Corp., supra,* 416 U.S. at 476, 94 S.Ct. at 1883; *Midland-Ross Corp. v. Sunbeam Equipment Corp.*, 316 F.Supp. 171, 177 (W.D.Pa.1970), *citing Cornell-Dublier Electric Corp. v. Aerovox Corp.*, 71 U.S.P.Q. 153, 154 (Mass.Sup.Ct.1946).

Third, Permagrain also disclosed the process used in constructing Genuwood in its patent. Permagrain's patent reveals the components of Genuwood, the sequence of their assembly, and the ranges of temperatures and pressures required to bond those components together in laminated form. No patent protection is claimed for anything except the bondable backing, which is not employed in Naturwood. A product which does not fall within the scope of a patent can be copied by a competitor. *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). After a patent is granted, a claim that the use of unpatented methods described in the patent constitutes theft of trade secrets is anamolous, since "the grant of the patent is a public disclosure not only of the process defined in the [patent] claims but also of any trade secrets described in the specifications." *O'Brien v. Westinghouse Electric Corporation*, 293 F.2d 1, 13 (3d Cir. 1961). Permagrain can scarcely claim that the composition and manufacturing process for Genuwood is a trade secret, when it revealed in great detail the material composition and process of manufacture for Genuwood.

The Massachusetts Supreme Court has ruled that even if competitors are likely to become aware of trade secrets through legitimate business procedures like research of patents, a competitor who acquires trade secrets through questionable means should not be permitted to gain an advantage by avoiding the normal costs of invention and duplication. *Analogic Corp. v. Data Translation, Inc., supra.* Here, however, U.S. Mat has not gained unfair advantage as a result of rapid development of its product: Naturwood is not an exact duplicate of Genuwood; it has significant problems which have halted its development; and it is providing no competition to Genuwood. In short, U.S. Mat is encountering the same difficulties in developing its product that Permagrain's predecessors experienced in developing Genuwood. In light of U.S.

Mat's lack of success with Naturwood, it is clear that whatever U.S. Mat may have learned of Genuwood's secrets from Victor Dossi, it has not benefited from it. The only harm that Permagrain can claim is that consumers might confuse the two products and associate Naturwood's defects with Genuwood. However, as noted above, the basic concept of Genuwood, lamination of plastic to wood, is not patented, and U.S. Mat is free to attempt to copy it.

## CONCLUSIONS OF LAW

1. U.S. Mat has not violated any provision of the Unfair Trade Practices and Consumer Protection Law of Pennsylvania. 73 Pa.Stat.Ann. § 201–1, *et seq.*

2. U.S. Mat has not violated any provision of the Lanham Act, 15 U.S.C. § 1121, *et seq.*

3. Massachusetts law governs the determination whether U.S. Mat committed the tort of theft of trade secrets.

4. U.S. Mat is not liable to Permagrain for theft of trade secrets.

5. Permagrain has not established that it is entitled to injunctive relief.