## ZERPOL CORPORATION

v.

## DMP CORPORATION.

Civ. A. No. 82–3757.

United States District Court,
E.D. Pennsylvania.

April 15, 1983.

**406**

Mark Alan Corchin, Philadelphia, Pa., for plaintiff.

Wilson M. Brown, III, Drinker, Biddle & Reath, Philadelphia, Pa., David A. White, Roddey, Carpenter & White, P.A., Rock Hill, S.C., for defendant.

## OPINION

LUONGO, Chief Judge.

Plaintiff, Zerpol Corporation (Zerpol), is a Pennsylvania corporation engaged in the manufacture and sale of pollution control systems used in the metal plating industry. Defendant, DMP Corporation (DMP), is a North Carolina corporation with its principal place of business in South Carolina, and a competitor of Zerpol. Zerpol instituted this civil action alleging causes of action arising under federal and state law based upon alleged defamatory and misleading statements contained in advertisements published by DMP in various trade journals. Jurisdiction over the state-law claims is alleged to exist by reason of diversity of citizenship. 28 U.S.C. § 1332. DMP now moves to dismiss the amended complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

The eleven advertisements which form the basis of this action (annexed to the amended complaint as exhibits A–K) were published by DMP over a 16-month period in three different journals subscribed to predominantly by members of the metal plating industry. Only five of the eleven publications complained of were different in content since some of the ads were run more than once. Exhibits A–B depict a queue of non-professional looking individuals holding numbers while standing in front of a dilapidated storefront, called "Sid's Waste Water Treatment Emporium." A "Now Being Served" sign is displayed prominently on the door. Inscribed in large bold letters over the photograph are the words: "DEADLINE, SCHMEDLINE; THESE GUYS ALL GOT A DEADLINE. JUST GET IN LINE . . . ." The copy accompanying the photograph states that Sid is "only sort of in the waste water treatment business;" that Sid doesn't know much about the business; and that Sid is not concerned about "compliance deadlines" because he knows that sooner or later companies will come to him due to a shortage of manufacturers of waste water treatment systems. The ad then states in bold letters: "Your number will be 'ONE', if you call DMP now." The copy continues, stating that DMP is an expert in the waste water treatment business, and that DMP will provide a quick and efficient solution, designed especially to meet the customer's waste water treatment problems. Finally, DMP represents in the ad that, "DMP designs your system, installs your system, trains your operators and provides the most thorough follow-up services in the field."

The second ad, Exhibit C to the amended complaint, continues with the same theme. Sid is depicted with a snide grin showing a potential customer his "SPECIAL OF THE WEEK." While Sid is shown pointing to a schematic drawing of his "Z–RO–TEC" system, a chuckling employee is shown in a back room with the actual system which is much akin to a Rube Goldberg contraption. In large bold letters inscribed over the photograph are the words: "SURE WE CAN DELIVER THIS LITTLE NUMBER IN 12–20 WEEKS. . . ." The accompanying copy states that Sid's "infamous Z-Ro-Tec

didn't get its name for nothing" since Sid specializes in "zero technology engineering." The copy continues, raising questions about whether Sid's system will work if it is delivered in 12–20 weeks, whether Sid will install it, whether Sid will train the operators, and whether Sid will guarantee that the system is "minimally adequate" to meet the customer's needs. Then, like the first ad, the copy turns to DMP's product, making the same representations made in the first ad.

The third ad, annexed to the amended complaint as Exhibit E, shows Sid talking on the telephone while standing in front of the schematic of his Z-Ro-Tec system. Just above his head, in large bold letters, are the words: "I DIDN'T SAY OUR SYSTEM WOULD GROW *WITH YOU,* PAL, I SAID IT'D GROW *ON YOU*!!!" The copy then describes the many complaints Sid has been receiving about his system and its lack of flexibility. DMP then describes the flexibility of its systems which utilize a "modular concept" that allows for growth of a system by adding modules as the customer's demands grow.

In the fourth ad, annexed as Exhibits F and G to the amended complaint, Sid is shown gesturing to a group of customers from behind the make-shift counter of his small storefront establishment. Protruding from Sid's back-pocket is an airline ticket, and several pieces of luggage and two tennis rackets are shown resting near his feet out of the view of the customers. Then, just above Sid's head in large bold letters are the words: "SURE I'LL BE RIGHT HERE IF YOU GOT ANY STUPID COMPLIANCE PROBLEMS." The accompanying copy begins: "Sid doesn't worry about EPA compliance ... he never understood it anyway. So if Sid's 'zero technology' contraption results in 'zero compliance,' just give him a call ... in Acapulco." The text continues, raising questions as to Sid's "compliance track record" and his understanding of local, state and federal regulations. Finally, DMP represents that it gives a written guarantee and has "the best follow-up services in the business."

The fifth and final ad, annexed as Exhibits H–K to the amended complaint, depicts the front of Sid's Waste Water Treatment Emporium with Sid standing in the doorway below the words "GRAND OPENING...." The copy accompanying the photograph states that Sid "specializes in zero-technology engineering," and that Sid knows little about waste water treatment. The text then states that Sid "and others like him" are opening up around the country because they know that there is a shortage of qualified water treatment manufacturers. Finally, the ad warns in bold print: "Don't help put Sid in business. Call us now...."

Although Zerpol is nowhere named in any of DMP's advertisements, Zerpol alleges in its amended complaint that "[t]he circumstances of [its] business and product are such that the advertisements published by [DMP] were intended to, and did identify [Zerpol] as the object of the libelous and defamatory remarks and depictions contained in those advertisements." Amended Complaint (Document 6), ¶ 14. Specifically, Zerpol alleges that it is the only company in the pollution control industry that manufactures a "zero discharge system" designed for use in the metal plating industry. Zerpol further alleges that its corporate name is a contraction of the words "zero" and "pollution," and that Zerpol's name and "zero discharge system" are clearly identifiable by members of the metal plating industry. Hence, Zerpol alleges that it was clearly understandable by members of the metal plating industry that "Sid's Z-Ro-Tec, zero technology engineering" referred to Zerpol's "zero discharge system."

The amended complaint contains four counts. Count I, under the heading trade libel, alleges that DMP published the advertisements knowing that they contained false and defamatory statements concerning Zerpol, its product, personnel and ancillary services. Count II, labelled unfair competition, charges that the advertisements contained false and misleading claims about Zerpol's goods and services in violation of § 43(a) of the Lanham Trade-

Mark Act, 15 U.S.C. § 1125(a), and in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons.Stat.Ann. §§ 201–1 to –9.2. In Count III, labelled tortious interference with business, Zerpol alleges that DMP, without justification or privilege, published the libelous advertisements with the intention of purposefully interfering with Zerpol's prospective and existing business relationships. Finally, in Count IV, denoted "anti-trust violations," Zerpol charges that DMP published the misleading and defamatory advertisements in an attempt to monopolize the market for pollution control devices used in the metal plating industry in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

## THE MOTION TO DISMISS

Attached to DMP's motion to dismiss are two affidavits and several exhibits which are intended primarily to show that the advertisements could not reasonably be understood as referring to Zerpol or its products. If I am unable to conclude on the basis of the pleadings alone that dismissal is appropriate, DMP suggests that I treat its motion as one for summary judgment and consider the supplementary materials. *See* Fed.R.Civ.P. 12(b). I will for reasons hereafter stated grant the motion to dismiss. I do not consider matters outside the pleadings.

### Count I: Trade Libel

■ The first count of the amended complaint bears the heading "trade libel." But, in addition to charging trade libel, more commonly known as commercial disparagement, the allegations in that count can also be read as charging defamation of the corporate plaintiff. Defamation and disparagement are two distinct torts. *See generally Developments in the Law—Competitive Torts,* 77 Harv.L.Rev. 888, 892–905 (1964); Note, *The Law of Commercial Disparagement: Business Defamation's Impotent Ally,* 63 Yale L.J. 65 (1953). While alike in many respects, there are important differences between the two. *Menefee v. Columbia Broadcasting Systems, Inc.,* 458

Pa. 46, 52–53, 329 A.2d 216, 219–20 (1974); *Restatement (Second) of Torts* § 623A, Comment g (1977); E. Kintner, *A Primer on the Law of Deceptive Practices* 174–77 (1978). These differences are largely explained by the interests the two torts are intended to protect. The action for defamation serves to protect one's interest in character and reputation. The cause of action for disparagement, on the other hand, protects economic interests by providing a remedy to one who suffers pecuniary loss from slurs affecting the marketability of his goods. *Restatement (Second) of Torts* § 623A, Comment g; 1 F. Harper & F. James, *The Law of Torts* §§ 5.1, 6.1 (1956).

■ The different interests served by the two torts are reflected plainly in the elements necessary to sustain each cause of action. Beginning with the action for defamation, the *Restatement (Second) of Torts* defines a defamatory statement as one that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement (Second) of Torts* § 559 (1977). *See also Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971); *Cosgrove Studio and Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751 (1962). Under the *Restatement* approach, which is consistent with that adopted by the Pennsylvania courts, one who publishes a defamatory statement concerning another may be held liable in damages if the statement is false; the publication is unprivileged; and the publication results from fault, at least amounting to negligence, on the part of the publisher. *Restatement (Second) of Torts* § 588. *See also* 42 Pa.Cons.Stat.Ann. §§ 8343–8344; *Corabi v. Curtis Publishing Co., supra.*

■ In contrast, a disparaging statement is one which the publisher intends should be understood, or which the recipient reasonably should understand as tending "to cast doubt upon the quality of another's land, chattels or intangible things." *Restatement (Second) of Torts* § 629 (1977). Because the tort of disparagement protects against pecuniary loss, the elements of the

cause of action are much more stringent than those for defamation. The publication of a disparaging statement concerning the product of another is actionable where (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity. *Id.* § 623A (1977); *see* W. Prosser, *The Law of Torts* 919–922 (4th ed. 1971).

▮ The recurring issue in this area lies in determining whether the derogatory publication gives rise to a cause of action for defamation, disparagement or both. Recitation of the basic precept that disparagement is the proper remedy where the statement reflects only on the manufacturer's product does little to aid the analysis because, in almost every instance, the same statement can be interpreted as casting aspersions on the manufacturer as well as his product. Resolution of the issue is critical, however, because if the publication is disparaging but not defamatory, the injured party must plead and prove pecuniary loss. *See Testing Systems, Inc. v. Magnaflux Corporation,* 251 F.Supp. 286, 290 (E.D.Pa. 1966); *Menefee v. Columbia Broadcasting Systems, Inc.,* 458 Pa. 46, 53, 329 A.2d 216, 220–21 (1974).[1] Thus to avoid the near impossible burden of proving special damages, plaintiffs have frequently attempted to frame their complaints to sound in defamation rather than disparagement. Needless to say, the results of their efforts have been mixed and few bright line distinctions exist. However, in one very early survey of the reported decisions, one court concluded:

The result of the above-cited cases appears to be that, where the publication on its face is directed against the goods or product of a corporate vendor or manufacturer, it will not be held libellous per se as to the corporation, *unless* by fair construction and without the aid of extrinsic evidence *it imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product.*

*National Refining Co. v. Benzo Gas Motor Fuel Co.,* 20 F.2d 763, 771 (8th Cir.) (emphasis added), *cert. denied,* 275 U.S. 570, 48 S.Ct. 157, 72 L.Ed. 431 (1927). *See also* W. Prosser, *The Law of Torts* 917–918 (4th ed. 1971).

▮ The applicable law of Pennsylvania appears to be in accord.[2] An action for defamation, without proof of special damage, will lie where the words used tend to impute to a business insolvency or credit unworthiness, *e.g., Will v. Press Publishing Co.,* 309 Pa. 539, 164 A. 621 (1932); *McIntyre v. Weinert,* 195 Pa. 52, 45 A. 666 (1900), lack of skill or competence in the trade, *e.g., Holland v. Flick,* 212 Pa. 201, 61 A. 828 (1905); *Price v. Conway,* 134 Pa. 340, 19 A. 687 (1890), criminal conduct, *e.g., Pfeifly v. Henry,* 269 Pa. 533, 112 A. 768 (1921); *Leitz v. Hohman,* 16 Pa.Super. 276 (1901), or dishonesty or want of integrity, *e.g., Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3d Cir.1980) (applying Pennsylvania law); *Cosgrove Studio and Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751 (1962). Applying the above principles to the facts as alleged in the amended complaint, I note initially that Zerpol has not pleaded any special damage flowing from the advertisements. Nevertheless, assuming for the moment that the statements in the advertise-

---

1. Although it is immaterial for purposes of this motion, it should be noted that there are other important distinctions between the two torts. *See generally Restatement (Second) of Torts* § 623A, Comment g (1977). For example, unlike in a defamation case, the plaintiff in a disparagement action bears the burden of proving that the statements published were false and that the publication was not privileged. *Menefee v. Columbia Broadcasting Systems, Inc., supra.*

2. The parties have not addressed which state's law the Pennsylvania courts would apply to the state law claims alleged in Zerpol's complaint. Although it is by no means clear, based upon the authority cited in their legal memoranda, the parties appear to agree that Pennsylvania substantive law governs the legal issues raised by the state law claims. Accordingly, I assume that Pennsylvania law applies.

ments concern Zerpol, Zerpol's failure to plead pecuniary loss is not fatal. The advertisements without the aid of innuendo impugn their target's understanding of EPA regulations as well as his general knowledge of the waste water treatment industry. As such, the advertisements clearly reflect an attack on the target's skill and competence in the industry and would tend to deter third persons from dealing with him. Hence, ignoring the "trade libel" heading of Count I of the amended complaint, the allegations thereunder may be read as sounding in defamation. Moreover because the advertisements are libelous per se, there is no requirement that Zerpol plead special damage. *See Price v. Conway, supra.*[3]

The real thrust of DMP's argument in support of its motion to dismiss Count I of the amended complaint is that the alleged libelous publications do not sufficiently identify either Zerpol or its products. DMP points out that the advertisements all relate to a fictitious business, "Sid's Waste Water Treatment Emporium." Nowhere in the advertisements is any mention made of Zerpol. Moreover, DMP argues that "[t]o the extent that they might be considered as referring to an actual supplier, the advertisements merely disparage persons engaged in the business of manufacturing waste water treatment systems who are, in fact, guilty of the unfavorable characteristics mentioned." Defendant's Memorandum in Support of Motion to Dismiss, at 3.

Of course, it is not dispositive of Zerpol's defamation or disparagement claim that the advertisements make no mention of Zerpol or its products. *Cosgrove Studio and Camera Shop, Inc. v. Pane, supra,* 408 Pa. at 320, 182 A.2d 751; *Callman Unfair Competition, Trademarks and Monopolies* §§ 11.13, 11.21 (4th ed. 1982). Nevertheless, a plaintiff in a defamation action does bear the burden of establishing the recipient's understanding of the defamatory publication as intending to apply to the plaintiff. 42 Pa.Cons.Stat.Ann. § 8343(a)(5); *Farrell v. Triangle Publications, Inc.,* 399 Pa. 102, 106, 159 A.2d 734 (1960). In this regard, the test is whether the defamatory communication may reasonably be understood as referring to the plaintiff. *Farrell v. Triangle Publications, Inc., supra; Zelik v. Daily News Publishing Co.,* 288 Pa.Super. 277, 431 A.2d 1046, 1049 (Pa.Super.1981). It is not enough that plaintiff understands the communication to be about him. Nor is it material that the publisher did not intend the communication to apply to plaintiff.[4] *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 180, 191 A.2d 662 (1963) ("if one hurls defamatory epithets in a manner to strike one to whom they seem, because of fortuitous circumstances, peculiarly to fit, he is liable as much as if he had aimed his remarks precisely at that person"); *Restatement (Second) of Torts* § 564 (1977).

Surprisingly, research of Pennsylvania law has uncovered no reported decision involving an actual person who claims to have been defamed by a publication about a ficti-

---

**3.** A word of caution is appropriate. That one may defame another without intending to do so should not be construed to imply that liability may be imposed without fault. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010–11, 41 L.Ed.2d 789 (1974). For the finder of fact to conclude that the advertisements are about Zerpol is insufficient to impose liability on DMP. At a minimum, Zerpol would also have to establish that DMP, "either intentionally or by want of due care and diligence in ascertaining the true facts," *Clark v. North American Co.,* 203 Pa. 346, 352, 53 A. 237 (1902), failed to perceive the natural and reasonable inference created by the advertisements that plaintiff was the person to whom the publications referred.

**4.** Zerpol argues also that DMP's intent in publishing the defamatory statements is a factual issue which cannot be resolved on a motion to dismiss. Hence, Zerpol contends that it should be afforded discovery to inquire into the state of mind of the DMP employees responsible for the publication in order to determine whether Zerpol was the intended target of the advertisements. As discussed earlier, however, DMP's intention is irrelevant if the readers of the advertisement could not reasonably conclude that Zerpol was the target of their attack. *Clark v. North American Co., supra,* 203 Pa. at 352, 53 A. 237. DMP's argument that it was unaware of Zerpol's existence is unavailing for this same reason.

tious character. Those jurisdictions that have addressed the question do permit an individual to sue in defamation for a publication about a fictitious person so long as the recipients of the publication could reasonably conclude that the matter was about the plaintiff. *E.g., Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980); *Fetler v. Houghton Mifflin Co.,* 364 F.2d 650, 651 (2d Cir.1966); *Davis v. R.K.O. Radio Pictures, Inc.,* 191 F.2d 901, 904 (8th Cir.1951); *Smith v. Huntington Publishing Co.,* 410 F.Supp. 1270, 1273 (S.D.Ohio 1975), *aff'd without opinion,* 535 F.2d 1255 (6th Cir.1976). This view is adequately discussed by the *Restatement*:

> *Fictitious character.* A libel may be published of an actual person by a story or essay, novel, play or moving picture that is intended to deal only with fictitious characters if the characters or plot bear such a resemblance to actual persons or events as to make it reasonable for its readers or audience to understand that a particular character is intended to portray that person. Mere similarity of name alone is not enough; nor is it enough that the readers of a novel or the audience of a play or a moving picture recognize one of the characters as resembling an actual person, unless they also reasonably believe that the character is intended to portray that person. If the work is reasonably understood as portraying an actual person, it is not decisive that the author or playwright did not so intend....

*Restatement (Second) of Torts* § 564, Comment d. It would appear, based upon the Pennsylvania Supreme Court's decision in *Clark v. North American Co.,* 203 Pa. 346, 53 A. 237 (1902), that the Pennsylvania courts would apply the same test. In *Clark,* the defendant newspaper reported that John Clark, a watchman at a particular neighborhood park, had been arrested and charged with burglary. James Clark, a watchman at that same park, brought suit alleging that he had been libeled by the report. The trial judge instructed the jury that they should find for defendant if they found that the news report intended to refer to John Clark. The Pennsylvania Supreme Court concluded that this instruction was improper:

> The passage from the charge ... was also erroneous in the form of the question put to the jury, "Now did that article mean to assert that this plaintiff here was arrested .... or did it mean what it says, that John Clark was arrested," etc. This was unfair to the plaintiff, for while the article does say that John Clark was arrested, it also says that. he was the watchman in Starr Garden Park, a description that pointed directly to the plaintiff. Test it by taking the latter clause and supposing the question had been put to the jury, "Did the article mean that one John Clark was arrested, or did it mean what it says, that the watchman at Starr Garden Park was arrested," and the defendant clearly would have had reason to complain that the charge laid the weight of emphasis on the part of the article unfavorable to it. In *Hays v. Brierly,* 4 Watts, 392, Chief Justice Gibson said, "If a slight change in the name were to shield a slanderer from legal animadversion, every man, however clumsy his invention, might securely libel his neighbor at pleasure." The variation in the names was not the controlling feature in the present case, and should not have had undue prominence. The proper way to submit it to the jury was to call their attention to the fact that the name used in the article did not refer to the plaintiff, but to one John Clark, a different person, but on the other hand, the description pointed directly to the plaintiff and the jury should consider the whole article and determine from all the evidence, whether notwithstanding the difference of name, the description was such either intentionally or by want of due care and diligence in ascertaining the true facts, that there would be a natural and reasonable inference that the plaintiff was the person referred to. If there would, the defendant was liable.

*Id.* 203 Pa. at 351–52, 53 A. 237. *Cf. Schonek v. W.J.A.C., Inc.,* 436 Pa. 78, 258 A.2d

504 (1969); *Farrell v. Triangle Publications, Inc., supra,* (dealing with group libel).

In sum, the motion to dismiss Count I of the amended complaint turns on whether the readers of the advertisements could reasonably conclude that they were about Zerpol. Because Zerpol is not specifically named in the advertisements, the circumstances surrounding their publication or the descriptions used therein must, in the first instance, tend to identify Zerpol. *Cosgrove Studio and Camera Shop, Inc. v. Pane, supra,* 408 Pa. at 319, 182 A.2d 751; *Burkhart v. North American Co.,* 214 Pa. 39, 43, 63 A. 410 (1906). For example, the defendant in *Cosgrove* published a libelous advertisement in response to an advertisement published by plaintiff the previous day. Although no descriptions or names were used in the defamatory advertisement, the court had no trouble in finding that the circumstances of its publication were such that a jury could reasonably conclude that it referred to plaintiff. Similarly, in *Burkhart, supra,* it was held that the plaintiff was sufficiently identified in an article about an orchestra's bassoon player where plaintiff was the sole bassoon player in that orchestra.

Before analyzing the advertisements and the averments of the complaint in light of the foregoing principles, I point out that I am not unmindful of the limitations of a motion to dismiss under Fed.R.Civ.P. 12(b)(6). The Court of Appeals for the Second Circuit recently discussed these limitations as they apply to the very issue now before me:

It is sufficient for dismissal purposes that [plaintiff] has advanced colorable claims of having been identified and described by defamatory comment. Although charges of libel and slander under former practice were considered largely vexatious and their litigation discouraged by requirements that such contentions be set forth in considerable detail, the federal rules do not require special pleading. Accordingly, the mode of pleading defamation is governed by Rule 8, Fed.R. Civ.P., which requires only that plaintiff's charges be set forth in a short and concise statement, detailed only to the extent necessary to enable the defendant to respond and to raise the defense of res judicata if appropriate. The pleading of additional evidence is not only unnecessary, but in contravention of proper pleading procedure. Such additional information is now available through the liberalized discovery provisions.

Furthermore, it has long been the rule that extrinsic evidence is admissible to buttress the claim that the defamation is "of and concerning" the plaintiff and the fact that resort to such evidence may be necessary does not defeat the claim.

*Geisler v. Petrocelli,* 616 F.2d 636, 639–40 (2d Cir.1980) (citations deleted). *See also Baxter Travenol Laboratories, Inc. v. LeMay,* 93 F.R.D. 379, 381 (S.D.Ohio 1981).

With these admonitions in mind, I turn to the pleadings in this case. Zerpol in its amended complaint does plead innuendo in support of its allegation that the advertisements do identify Zerpol as the object of the defamatory statements and depictions. Specifically, Zerpol alleges that the name "Zerpol" means "zero pollution," and that this meaning is readily understood by members of the metal plating industry. Zerpol further alleges that it manufactures a "zero discharge system" for the management of waste water effluent; that this system is designed specifically for use in the metal plating industry; that Zerpol is the "only company" engaged in pollution control to manufacture a zero discharge system designed for use in the metal plating industry; and that members of that industry readily associate Zerpol with the "zero discharge system" for waste water treatment. Amended Complaint ¶¶ 10–12. Finally, Zerpol alleges that DMP's "advertisements describe, albeit by caricature, the system and rudimentary technology employed by plaintiff in the Zerpol 'zero discharge system' of pollution control." *Id.* ¶ 13. The alleged defamatory advertisements sued upon are attached as exhibits to the amended complaint.

On their face, the advertisements all concern a fictitious enterprise known as "Sid's Waste Water Treatment Emporium." In the series of advertisements, Sid is described as a new entrant into the waste water treatment industry. The advertisements also reveal that Sid specializes in "zero technology engineering" and manufactures the "Z-Ro-Tec All Purpose Waste Water Treatment System." A schematic and apparent mock-up are depicted in one of the advertisements. Apart from the derogatory statements about Sid, the only other descriptive information revealed about Sid is that he markets his Z-Ro-Tec system as his "special of the week."

DMP contends that the allegations in the amended complaint are insufficient to state a claim because the advertisements do not adequately identify Zerpol. DMP points out that conspicuously absent from the advertisements are the words "Zerpol," "zero pollution," "zero discharge" or "zero discharge system." Thus even accepting Zerpol's allegation that it is the sole manufacturer of the "zero discharge system," DMP argues that there is nothing in the advertisements which even vaguely refers to such a system.

Zerpol responds that it is reasonable to infer from the advertisements that they are directed at Zerpol because the target of their attack is obviously:

1. A competitor in the metal plating wastewater treatment industry;

2. A competitor who is selling, manufacturing, and servicing a zero discharge closed circuit system;

3. A competitor whose price for this type of system is either equal to or less than its open circuit counterpart in price and not the highly expensive complex technology associated with reverse osmosis, or ion exchange, and;

4. Most importantly, a competitor who is presently engaged in advertising and selling its product and therefore competing for the same dollars earmarked for wastewater treatment.

Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss (Document 11), at 6. Zerpol also points out that the alleged defamatory advertisements refer to "Z-Ro-Tec" and "zero technology engineering." Zerpol contends that these references were directed at it because, in early 1981, Zerpol disseminated promotional literature about the "zero technology" process utilized in its new and unique pollution control devices.

After carefully reviewing the amended complaint and the alleged defamatory advertisements, I conclude as a matter of law that the advertisements cannot reasonably be interpreted as concerning Zerpol or its products. Notwithstanding Zerpol's assertions to the contrary, there is nothing in the advertisements upon which one could conclude that the advertisements disparage a "closed circuit zero discharge system" as opposed to an "open circuit" system. Indeed, the advertisements make no reference whatsoever to any "zero discharge system." Furthermore, none of the advertisements refer to closed circuitry or open circuitry. While a schematic of the Z-Ro-Tec system is visible in one of the advertisements, the detail is so obscured that it is impossible to assess the workings (if any) of the system. Although Zerpol alleges that the advertisements describe by caricature the "rudimentary technology" employed in Zerpol systems, there is no claim that the Z-Ro-Tec schematic or mock-up resembles in any way the design or mechanics of Zerpol's products. I doubt that even Zerpol would disagree that its rudimentary technology is more sophisticated than that depicted in the advertisements. The schematic is unmistakably a fiction. As for the mock-up, it appears better suited to the fermentation of alcohol than the treatment of waste water. It, too, is a pure fiction and cannot reasonably be understood otherwise.

As for Zerpol's assertion that it used the words "zero technology" in its direct mail advertising,[5] I acknowledge that the advertisements do contain sporadic references to "zero technology engineering," the "Z-Ro-

---

**5.** For purposes of this motion, I accept Zerpol's assertion that it used the words "zero technolo-gy" in its advertising even though there is nothing in the pleadings to support the fact.

Tec" system and a "zero technology contraption." Nevertheless, these terms by themselves are hardly sufficient for reasonable minds to associate Zerpol with the fictional personage characterized in the advertisements. The advertisements must be read in their entirety. To single out select phrases and draw the inference that Zerpol is the intended target is to totally mischaracterize the communications. The remainder of the advertisements dispel any notion that Sid's Waste Water Treatment Emporium is a pseudonym for a specific waste water treatment business. From the line of customers "now being served" to the sign in Sid's storefront reading "no checks cashed," it is obvious that Sid is a farce. It would be a gross distortion to interpret the advertisements any other way.

In addition, it should be observed that there is no great associative informational value in the words "zero technology." Before Zerpol began operations in 1980, Congress had passed the Federal Water Pollution Control Act Amendments of 1972, P.L. No. 92–500, 33 U.S.C. § 1251, *et seq.* The EPA regulations referred to in the advertisements were adopted to enforce compliance with this Act. The declaration of goals and policy expressed in the Act calls for the elimination of the discharge of pollutants into the navigable waters by 1985. 33 U.S.C. § 1251(a)(1). This policy goal is referred to repeatedly in the legislative history of the Act as the "no-discharge policy." *See* S.Rep. No. 414, 92d Cong., 1st Sess. 11 & *passim, reprinted in* [1972] U.S.Code Cong. & Ad.News 3668, 3678 & *passim. See also* S.Rep. No. 1236, 92d Cong., 2nd Sess. 100, *reprinted in* [1972] U.S.Code Cong. & Ad.News 3776, 3777 ("Other national policies ... include ... major research and demonstration efforts to develop technology necessary to achieve the zero-discharge goal"). Not surprisingly, courts have often

referred to the no-discharge policy as the "zero-discharge" policy.[6] The Act further declares that "it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollution into the navigable waters." 33 U.S.C. § 1251(a)(6). In addition to declaring goals and policies, the Act prescribes specific effluent limitations aimed at attaining the zero discharge goal. By July 1, 1977, point sources of water pollution are directed to apply the "best practicable control technology currently available," and by July 1, 1983, the "best available technology economically achievable" is to be applied. *Id.* § 1311(b). All of this is merely to point up that the zero discharge goal of the Act is inseparable from the policy of developing and implementing the technology necessary to the attainment of that goal. Those even vaguely familiar with the legislation would be aware of this. More importantly, the legislation's emphasis on technology to eliminate the discharge of pollutants would not escape the attention of those persons in the metal plating industry charged with the procurement of pollution control devices, *i.e.,* the intended recipients of the advertisements objected to in the instant case. The Act thus presumes that zero discharge is attainable only through the utilization of highly sophisticated pollution control technologies. But, as portrayed in the advertisements, Sid's "technology" lacks even the hint of sophistication. Indeed, DMP openly questions whether Sid's system will work. There is never a suggestion that "zero discharge" might be achieved through the utilization of Sid's Z-Ro-Tec system. On the contrary, it is hard to believe that it could. In short, the effect of the advertisements is to dispel any thought of "zero discharge" and, by implication, Zerpol. To repeat, the

---

**6.** *E.g. National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 178–80 (D.C.Cir.1982); *Kennecott Copper Corp. v. EPA,* 612 F.2d 1232, 1244 (10th Cir.1979); *National Crushed Stone Ass'n v. EPA,* 601 F.2d 111, 121 (4th Cir.1979); *BASF Wyandotte Corp. v. Costle,* 598 F.2d 637, 663 (1st Cir.1979), *cert. denied,* 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980); *Weyerhaeu-*

*ser Co. v. Castle,* 590 F.2d 1011, 1043 (D.C.Cir. 1978); *American Iron & Steel Institute v. EPA,* 526 F.2d 1027, 1046 (3d Cir.1975), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *CPC Int'l Inc. v. Train,* 515 F.2d 1032, 1035 (8th Cir.1975), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

only reasonable inference to be drawn from these advertisements is that Sid's Waste Water Treatment Emporium is a purely fictional enterprise. All that objectively can be said to be common between it and Zerpol is that both are engaged in the manufacture of waste water treatment equipment. Therefore, I conclude as a matter of law that the advertisements cannot reasonably be interpreted as concerning Zerpol or its products. DMP's motion to dismiss Count I of the amended complaint will be granted.

### Count II: Unfair Competition

Count II of the amended complaint alleges that the advertisements contain false, misleading and disparaging statements about Zerpol and its goods in violation of both § 43(a) of the Lanham Trade-Mark Act, 15 U.S.C. § 1125(a), and Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.Cons.Stat.Ann. §§ 201–1 to –9.2. Because I have determined that the advertisements cannot reasonably be said to be about Zerpol, DMP's motion to dismiss Court II must also be granted.

Apart from the issue of whether Zerpol is sufficiently identified as the object of the disparaging statements, there are independent grounds for dismissing the unfair competition count of the complaint. As I held in *Permagrain Products, Inc. v. U.S. Mat & Rubber Co.*, 489 F.Supp. 108 (E.D.Pa. 1980), a private cause of action under the Pennsylvania Unfair Trade Practices and Consumer Protection Law is available only to purchasers or lessors of goods used "primarily for personal, family or household purposes." 73 Pa.Cons.Stat.Ann. § 201–9.2.

As for Zerpol's claim under the Lanham Act, it has been held repeatedly that "[f]alse advertising or representations made by a defendant about a plaintiff's product are not covered by section 43(a)." *Bernard Food Industries, Inc. v. Dietene Co.*, 415 F.2d 1279, 1283 (7th Cir.1969), *cert. denied*, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970). *See e.g., Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 278

(2d Cir.1981); *Fur Information & Fashion Council, Inc. v. E.F. Timme & Son, Inc.*, 501 F.2d 1048, 1051–52 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); *Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D.Pa. 1982); *Ragold, Inc. v. Ferrero, U.S.A., Inc.*, 506 F.Supp. 117, 127–28 (N.D.Ill.1980). In its memorandum in opposition to the motion to dismiss, Zerpol attempts to recast the allegations in Count II to complain of false comparative advertising. While § 43(a) does prohibit false comparative advertising, *see, e.g., U-Haul International, Inc. v. Jartran, Inc.*, 681 F.2d 1159 (9th Cir.1982), I do not accept Zerpol's argument that the disparaging statements should be read as affirmative comparisons of Zerpol's product with DMP's. Under Zerpol's interpretation, every state law disparagement action could be converted into a claim for violation of the Lanham Act. I am aware that § 43(a) is to be interpreted broadly, *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649, 651 (3d Cir.1954), but Congress did not intend § 43(a) to encompass every undesirable business practice. *Bernard Food Industries, Inc. v. Dietene Co., supra.* It is obvious from the complaint that Zerpol's claim is for disparagement. Under the authority of *Bernard Food Industries, Inc., supra*, such a claim is not actionable under § 43(a).

### Counts III and IV: Interference With Business Relations and Violation of the Antitrust Laws

Zerpol alleges in Counts III and IV that DMP's publication of the false and misleading statements about Zerpol constituted (1) an intentional interference with Zerpol's present and prospective business relationships, and (2) an attempt by DMP, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, to monopolize competition in the market for waste water treatment systems used in the metal plating industry. Because the publications are alleged to be false only to the extent that they concern Zerpol, Counts III and IV will be dismissed for reasons explained earlier with respect to Count I.

The advertisements cannot reasonably be interpreted as concerning either Zerpol or its products.

Accordingly, for reasons set forth above, DMP's motion to dismiss the amended complaint for failure to state a claim will be granted.